Luis Adonay PÉREZ, (F–4374–98)

Carlos Alberto Robles–Benevides,
(F–2001–98)

Santos Felipe Bonilla, (F–2332–98)

José Roberto Salamanca, (F–4375–98)

and

Oscar Villatoro, Appellants,
(F–2940–98)

v.

UNITED STATES, Appellee.

Nos. 99–CF–107, 02–CO–1242, 06–CO–341, 99–CF–207, 02–CO–1205, 99–CF–212, 02–CO–1385, 06–CO–1164, 99–CF–226, 02–CO–1253, 06–CO–1563, 99–CF–257, 01–CO–1019, 02–CO–1231, 06–CO–1170.

District of Columbia Court of Appeals.

Argued Feb. 8, 2005.

Resubmitted Feb. 24, 2009.*

Decided March 26, 2009.

---

* Subsequent to oral argument, the court issued an order remanding the cases to allow an opportunity for appellants to file a motion pursuant to D.C.Code § 23–110 in light of the government's disclosure shortly before oral argument that it had failed to disclose the potential bias of Rosa García, a key government witness at trial. All appellants, except Robles–Benevides, filed a motion. The trial court denied the motions after a hearing, and appellants appealed. This court consolidated the four new appeals with the appellants' eleven pending appeals. In addition, after this court's decision in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc), *cert. denied*, 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007), appellants Villatoro, Salamanca and Robles–Benevides raised a new challenge to their convictions for first-degree murder. Briefing on the new consolidated appeals, following the orders on remand, and supplemental briefing on the *Wilson–Bey* issue was completed on February 24, 2009.

Kenneth H. Rosenau, Washington, appointed by the court, for appellant Luis Adonay Pérez.

M. Elizabeth Kent, Washington, appointed by the court, for appellant Carlos A. Robles–Benevides.

Robert S. Becker, Washington, appointed by the court, for appellant Santos Felipe Bonilla.

Paul J. Riley, appointed by the court, for appellant José Roberto Salamanca.

Jenifer Wicks, Washington, for appellant Oscar Villatoro.

David B. Goodhand, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Elizabeth Trosman, Anthony Asuncion, James S. Sweeney and David C. Woll, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Anthony Asuncion, James S. Sweeney, and Florence Pan, Assistant United States Attorneys, filed a supplemental brief for appellee.

Before WASHINGTON, Chief Judge,** RUIZ, Associate Judge, and KING, Senior Judge.

** Chief Judge Washington was an Associate Judge of the court at the time of argument.

Ruiz, Associate Judge:

The five coappellants in this case, Luis A. Pérez, Carlos A. Robles–Benevides, Santos F. Bonilla, José R. Salamanca, and Oscar Villatoro, challenge their convictions arising out of a brutal murder and various assaults, in which an unidentified homeless man was beaten and a passerby who intervened to stop the beating of the homeless man was beaten and stabbed to death. A second passerby who then intervened to stop the assault on the first passerby was also assaulted. An eyewitness was later threatened and assaulted in an effort to intimidate her into not testifying.

Appellants challenge their convictions on multiple grounds, which can be grouped into the following eight claims: (1) the government abused the grand jury system to intimidate alleged eyewitnesses and suborned perjured testimony favorable to the government; (2) the government violated their right to due process by not disclosing to defense counsel evidence and witnesses that could have undermined the credibility of government witnesses; (3) the trial court improperly admitted hearsay statements in a joint trial under the exception for statements against penal interest; (4) the trial court should have granted their requests for severance because they were prejudiced by being tried jointly; (5) the prosecutor engaged in improper argument by alluding to the fact that the defendants would not testify, by using inflammatory language, and by making references to the defendants' gang membership; (6) the trial court improperly refused to grant a mistrial because some of the jurors were biased against them; (7) the trial court improperly denied the § 23–110 motions of two of the appellants, whose counsel, they claim, were constitutionally ineffective; and (8) the aiding and abetting instruction we held erroneous in *Wilson–Bey, supra* note *, 903 A.2d at 818, was given to the jury in their trial and tainted their convictions for first-degree murder. We agree that the erroneous aiding and abetting instruction constituted plain error and reverse the first-degree murder convictions of appellants Robles–Benevides, Bonilla and Villatoro, and remand to the trial court with instructions to vacate their first-degree murder convictions and enter convictions and resentence them for murder in the second degree. On remand, the trial court should consider whether Pérez's conviction for first-degree murder while armed based on aiding and abetting liability should be permitted to stand. We conclude that appellants' other challenges, singly and in the aggregate, do not require reversal, and we affirm their remaining convictions.

## I. The Evidence Presented at Trial

Based on the testimony of four eyewitnesses,[1] each one of whom knew appellants personally, the government adduced the following evidence at trial. On the evening of March 14 and into the early hours of March 15, 1998, appellants were at the Diversité nightclub at 14th and Q Streets, Northwest. Appellants were members of a gang called "Mara R." At one point, government witness José Benítez, who was a fellow Mara R gang member, saw appellant Oscar Villatoro flash a gang sign in the nightclub at members of a rival gang, Mara Salvatrucha, commonly known as "MS–13." A fight then broke out in the

His status changed to Chief Judge on August 6, 2005.

1. The four eyewitnesses were: (1) José Benítez, who was originally charged as a codefendant, but pled guilty and testified at trial against his former fellow gang members; (2) José Pérez, brother of appellant Luis Pérez; (3) Hugo Alemán, an acquaintance of appellants; and (4) Rosa García, former girlfriend of Benítez.

night club. The night club operator shut the club down early as a result, and everyone was forced out onto the streets at approximately 3:00 a.m., March 15. Hostilities between the rival groups apparently ceased at that point, but the Mara R gang's aggressive attitude persisted.

Once outside, Benítez saw appellant Villatoro "jump" an unidentified, homeless man, and start to beat him up.[2] Benítez heard appellant Pérez shout "R, R" while making his gang's hand signal, and joined Villatoro in the assault.[3] The homeless man tried to escape, but ran into appellant Salamanca, who hit him, knocking him to the ground. Gang members Benítez, Navarette,[4] and "Abuelo"[5] joined in the assault by kicking the homeless man as he lay on the ground.

Greg Alexander was driving his maroon Oldsmobile on 14th Street past this scene with his two cousins and a friend, Warren Helm. When they noticed the assault, Alexander stopped the car and the four occupants got out to intervene on the homeless man's behalf. The attackers, however, left the homeless man and turned toward the four men. The intervenors retreated to the car when they saw that some of the men in the group had knives. The group

followed them, throwing rocks and bottles at the Oldsmobile,[6] and surrounded Helm before he could get into the car. Alexander drove off with his two cousins, while Helm tried to escape by running north on 14th Street.

Benítez testified that he chased Helm on foot along with appellants Pérez and Salamanca, and others.[7] As they gave chase, Benítez saw appellant Bonilla driving his Honda north on 14th Street, with appellant Robles–Benevides and two other fellow gang members, Walter Velásquez ("Catinga")[8] and Douglas Ventura.[9] When the car reached Helm, Bonilla stopped the car and Robles–Benevides, Velásquez, and Ventura got out of the car.

It appeared to Benítez that when Helm saw Bonilla's car pull up, he initially thought they were strangers stopping to help him. Once they were out of the car, however, it became obvious they were not there to offer assistance: Robles–Benevides and Ventura started hitting Helm and Velásquez stabbed him. Benítez testified that Bonilla also got out of the car, but did not know what he did. When Helm tried to run away, Ventura grabbed him and threw him to the ground. Benítez testified that those who had been chasing

2. Appellants Bonilla and Salamanca also testified that Villatoro attacked the homeless man.

3. Appellant Bonilla also saw Pérez beat the homeless man.

4. Jorge Luis Navarette was arrested and charged with appellants. He absconded before trial, and a bench warrant was issued for his arrest. Several years after appellants' trial, he was detained at the Arizona–Mexico border in 2002 and returned to the District of Columbia. Navarette pled guilty to conspiracy and manslaughter for these assaults in November 2003.

5. The Mara R gang member known by the nickname, "Abuelo" (meaning "grandfather"

in Spanish) was never apprehended, nor could the government determine his name.

6. Benítez testified that appellants Villatoro and Pérez, among others, threw bottles and rocks at the car.

7. Bonilla affirmed at trial that he told the police that he saw his friends, including appellants Pérez and Villatoro, chase Helm on foot.

8. Velásquez's nickname is variously spelled in the record and the briefs as "Catinga" and "Catigna" (the letters "gn" could be a phonetic spelling of "Catiña.")

9. Velásquez and Ventura had not been apprehended at the time of appellants' arrests.

Helm on foot arrived at that time and joined in the attack. Appellants Robles–Benevides and Pérez, along with Ventura, Navarette, and "Abuelo," all beat Helm. Benítez admitted that he also participated in the assault.

At that moment, another passerby became involved. Barry Hallner, who worked as a medical assistant, was driving home with friends along 14th Street when he saw a "gang of people" chasing Helm. He saw the group eventually encircle Helm, beat him, and throw him to the ground. Hallner stopped his car and approached the group with a flashlight, yelling for them to stop, which only seemed to infuriate the assailants. Hallner saw a man in a blue jacket, whom he identified later that morning as Robles–Benevides, "kick [Helm] so hard in the chest you could just feel it." When Hallner jumped into the crowd to defend Helm, somebody hit him and knocked the flashlight out of his hand. As Hallner bent down to retrieve the flashlight, the man in the blue jacket (Robles–Benevides) kicked him in the throat. When the gang started to flee, Hallner yelled to his friends in the car to call 911. Hallner approached Helm, who was lying on the ground, and saw that Helm's "intestines were hanging out of his stomach," and that he had had suffered "quite a number of stab wounds."

When Greg Alexander, who had driven around the block after fleeing the scene, came back to 14th Street, he saw Helm stabbed to death and an "older, white guy" (Hallner) standing over him.

Three other government witnesses corroborated various parts of Benítez's testimony. Appellant Luis Pérez's brother,

José ("Chino") Pérez, saw a fight outside the club after it had closed. José Pérez testified that he saw a red car stop, and five African–American men came out of the car and approached the group fighting outside the nightclub. He then saw all but one of the men reenter the car and drive off. José Pérez testified that the gang punched, kicked, and stabbed the man left behind (Helm). He saw Velásquez, Ventura, and "Abuelo" stab Helm. He saw his brother, appellant Luis Pérez, along with appellants Villatoro and Robles–Benevides punch Helm, and saw government witness Benítez punch and kick him (as Benítez had admitted).

When Rosa ("China") García left the club, she saw appellant Villatoro across the street arguing with a homeless man. She then walked north on 14th Street with her friends, Sandy Leonzo, Blanca Buruca, Mayra Rivera, and José ("Chino") Guevara.[10] At the intersection of 14th and Swann Streets (two and a half blocks north), she heard a "black male" crying out, "no, no, no." When she looked back, García saw Velásquez stabbing the man (Helm), and appellant Villatoro, along with Ventura, Benítez, and others, punch and kick Helm.[11] She also saw Bonilla inside a car with the doors open, watching and waiting. García testified that she drank only club soda at the nightclub, but that her vision was not good, and because she was not wearing her glasses, she had to squint ("blink") in order to see the assault that occurred half a block away. She further testified that later that same day (March 15), appellant Salamanca choked her and threatened to kill her if she cooperated with the police's investigation.

10. José Pérez and José Guevara were both known as "Chino."

11. While at one point Rosa García testified that she saw Robles–Benevides beating Helm,

she later omitted his name from a list of assailants. Therefore, Villatoro was the only appellant García consistently placed at Helm's assault and murder.

Hugo Alemán ("Loco Hugo") also testified for the government, although reluctantly. He initially testified that all he saw were some people running up 14th Street, but that he could not remember seeing the assault because he was very drunk. When the prosecutor confronted him with his grand jury testimony, Alemán acknowledged that he saw appellant Pérez hit a homeless man; that the gang threw bottles at a car; and that the car left one of its occupants behind. He affirmed that he had testified at the grand jury that appellant Salamanca, along with Ventura and Velásquez, took off with appellant Bonilla in a car, while others, including Villatoro and Pérez, pursued Helm on foot. Alemán affirmed that he had told the grand jury the names of Helm's assailants: Pérez and Benítez hit him; Villatoro pulled him to the ground and hit him; Robles–Benevides hit him while he was on the ground; Bonilla hit him, and went back to his car; and finally, Velásquez and Ventura made stabbing motions.[12] But Alemán then recanted his grand jury testimony by saying that he only saw the gang catch Helm, and that he did not see what happened next because he was drunk, too far away, and the group was huddled in a pile.

Officer Torres testified that Benítez, José Pérez (brother of appellant Luis Pérez) and appellant Robles–Benevides were detained on the scene. Appellants Bonilla, Pérez, Salamanca and Villatoro were arrested later pursuant to a warrant.

The defense offered two witnesses, as well as the testimony of appellants Bonilla, Salamanca and Pérez. Mayra Rivera contradicted Rosa García's testimony. Rivera testified that when she and García left the nightclub on March 15, they caught a taxi and went home and saw nothing of the assault. Rivera also contradicted García's testimony that she had only had a club soda, saying that she had seen García drink four glasses of liquor at the nightclub.

Rivera testified that on two separate occasions the prosecutor called her to the U.S. Attorney's Office and pressured her to identify appellants, but that she refused to go before the grand jury. On cross-examination, the prosecutor reminded her that when he had shown her a picture of the deceased Helm, she started to cry, saying that "they were animals." Rivera explained that she named the assailants at the interview because the prosecutor "pressur[ed] me a lot," and threatened to "put me in jail." In court, Rivera did not identify appellants as the assailants.

Gilfredo López, who met Benítez and Robles–Benevides in jail, testified for Robles–Benevides. He testified that Benítez told him that he, Benítez, had given Velásquez the knife he used for the stabbing, but that the government had pressured him to say that it was Robles–Benevides who gave Velásquez the knife.

Eugene Wimbush, who was working as a security guard at the Diversité nightclub, testified that when he saw a crowd beating up a homeless man, he broke up the fight and dispersed the crowd. He saw one African–American man and "about twelve" Hispanic men running up 14th Street.

Contrary to Benítez's testimony, Salamanca testified that he was not part of the group that chased Helm up the street on foot. Rather, he testified, he was asleep in Bonilla's car (Bonilla having offered to give him a lift home after the nightclub closed), and did not wake up until Bonilla later dropped him off at home.[13] He did corrob-

---

12. Alemán did not testify to seeing Salamanca join in the assault.

13. Salamanca was not charged with the assault and murder of Helm. He was charged

orate, however, that Robles–Benevides, Velásquez and Ventura were in the car with him.

Salamanca admitted that he talked to Rosa García the following day, but denied choking or threatening her. His neighbor, Stanislao Robles–Fuentes, testified that he was an eyewitness to this conversation and corroborated appellant Salamanca's version.[14]

Appellant Bonilla took the stand and testified that, though he did give a ride to appellants Salamanca and Robles–Benevides, as well as others (Velásquez and Ventura), he had no idea at the time that they were pursuing Helm, or that they had knives with them when they entered his car. He had often given the men rides home, and thought he was merely doing so again. Bonilla admitted on cross-examination, however, that he had told the police that "when the two black guys ran off, they went and got their knives. I think they had their knives when they got in my car."

According to Bonilla, when they reached the corner of 14th and S Streets, Velásquez ordered him to stop the car. He complied, and Robles–Benevides, Velásquez, and Ventura got out of the car. Bonilla testified that he got out of the car only to close the doors that his passengers had left open, and tried to drive off immediately because he saw Velásquez "knifing" Helm. While he was waiting at a red light up the street, Velásquez returned to the car—knife still in hand—and ordered Bonilla to drive him to a gambling hall. Bonilla testified that although he did not want Velásquez in the car, he drove him out of fear of what he had just seen.

Appellant Luis Pérez also took the stand in his defense. Pérez testified that he had left the nightclub at 1:00 a.m., two hours before everything happened, and did not know of the assaults until he was arrested two months later, in June, for murder.

*Procedural History*

Appellants were indicted by the grand jury on June 17, 1998 on a number of charges related to the assaults on the homeless man, Helm, and Hallner; the murder of Helm; and threats on García. Trial began on October 27, 1998, and on November 6 the jury returned convictions on each of the appellants.

For the attack on the homeless man, each appellant was charged with one count of assault, pursuant to D.C.Code § 22–504 (1996 Supp.). The jury found Pérez, Villatoro and Salamanca guilty of this charge. The jury also found Bonilla and Robles–Benevides guilty, but the trial court granted a directed verdict of acquittal as to them, because it found that the government had not adduced any evidence to support the conviction.[15]

For the killing of Helm, appellants Pérez, Villatoro, Bonilla and Robles–Benevides were charged with conspiracy to assault and to commit murder,[16] in violation

---

with assaulting the homeless man and with obstruction of justice by threatening and assaulting Rosa García.

14. Robles–Fuentes was married to defense witness Mayra Rivera. Rivera admitted that her husband was related to and shared the same last name "Robles" with appellant Robles–Benevides. Although Robles–Fuentes admitted that his legal name "in my papers"

included Robles, he denied being related to appellant Robles–Benevides.

15. According to government witness Benítez, appellants Bonilla and Robles–Benevides did not participate in the assault on the homeless man.

16. Although the indictment charged appellants with conspiracy to assault *and* to com-

of D.C.Code §§ 22–105(a), –2401, –3202 (1996 Supp.), as well as with first-degree premeditated murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1996 Supp.). The jury convicted all four appellants of these charges.

For kicking Barry Hallner when he tried to assist Helm, Robles–Benevides was charged with and convicted of assault with a dangerous weapon (shod foot), in violation of D.C.Code § 22–502 (1996 Supp.).

Salamanca was charged with and convicted of assaulting and threatening Rosa García, in violation of D.C.Code § 22–504 (1996 Supp.), and with obstruction of justice, in violation of D.C.Code § 22–722(a)(3)(B) (1996 Supp.).

Appellants were sentenced in January 1999, to various periods of incarceration, after which each appellant filed a timely notice of appeal. (Nos. 99–CF–107, 99–CF–207, 99–CF–212, 99–CF–226, and 99–CF–257). For the assault on the homeless man, appellants Pérez and Salamanca were sentenced to 180 days of imprisonment, and Villatoro was sentenced to 100 days. Appellants Pérez, Robles–Benevides, Bonilla and Villatoro were sentenced to 20 to 60 months of imprisonment for their conspiracy convictions to be served concurrently with their 30 years-to-life sentence for first-degree murder. Salamanca was also sentenced to 90 days in work release for assaulting García, and 180 days of imprisonment for threats, to be served con-

currently with 4 to 12 years for obstruction of justice.

In November 2001, Bonilla filed with the trial court a motion for a new trial, pursuant to Superior Court Criminal Rule 33, based on newly-discovered evidence that the government had improperly subpoenaed and pressured witnesses as well as *Brady* violations.[17] The claim of newly-discovered evidence, supported by an affidavit, was that Hugo Alemán had been threatened by the government into testifying falsely before the grand jury. The government filed an opposition to appellant's motion in March 2002, proffering an affidavit from the prosecutor attesting that the government had not unduly coerced Alemán. Appellants claimed that the prosecutor abused the grand jury system and violated their due process rights by repeatedly issuing subpoenas to interview potential witnesses, paying witnesses even when they did not testify before the grand jury, and pressuring witnesses into testifying before the grand jury. In addition to abusing the subpoena power, appellants claimed that the government had violated *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding not only its coercive use of subpoenas but also the names of impeachment witnesses. This evidence, they claim, would have undermined the credibility of two important government witnesses, Hugo Alemán and Rosa García.

---

mit murder, the court instructed the jurors, in response to their note to the court, that they could find appellants guilty of conspiracy either to assault *or* to murder.

**17.** The trial court determined that Bonilla and Villatoro, who joined Bonilla's motion, had timely filed pursuant to Rule 33 within three years of their conviction. It found, however, that because Robles–Benevides and Pérez did not join Bonilla's motion until

2002, more than three years after their convictions in 1998, their motions for a new trial pursuant to Rule 33 were time-barred. The trial court did, however, consider their "related constitutional claims as if raised under D.C.Code § 23–110," as it did for Salamanca, who raised related issues only in his § 23–110 motion of June 2002. The trial court therefore considered, as to all appellants, the claims of prosecutorial abuse and *Brady* violations raised in Bonilla's Rule 33 motion.

On June 18, 2002, the trial judge held a post-trial hearing on these motions and heard testimony from both Alemán and the prosecutor, Assistant United States Attorney ("AUSA") Anthony Asunción. The judge found that Alemán's post-trial recantation was incredible, and that AUSA Asunción had not abused the grand jury system or unduly coerced witnesses, nor had the government withheld evidence in violation of *Brady*. The court denied the motions for a new trial. Appellants then filed timely appeals from the trial court's denial of their new-trial motions and related § 23–110 claims. (Nos. 02–CO–1242; 02–CO–1205; 02–CO–1231; 02–CO–1385).

Appellants Villatoro and Salamanca filed § 23–110 motions claiming that they had received ineffective assistance from their trial counsel. The trial court denied their motions without a hearing, and appellants filed timely appeals. (Nos. 01–CO–1019; 02–CO–1253). As previously noted, see *supra* note *, following this court's limited remand in light of the government's belated disclosure of Rosa García's potential bias, appellants Pérez, Bonilla, Salamanca and Villatoro filed new § 23–110 motions for new trial. The trial court denied these motions after a hearing, and timely appeals were filed. (Nos. 06–CO–341; 06–CO–1164; 06–CO–1563; 06–CO–1170). All of the appeals have been consolidated. Moreover, appellants Robles–Benevides, Bonilla, and Villatoro added new claims of instructional error challenging their convictions for first-degree murder while armed as aiders and abettors following our decision in *Wilson–Bey*, 903 A.2d at 818. We now consider, in turn, each of the arguments made by appellants.

## II. Due Process Claims

### A. *Grand Jury Abuse and Subornation of Perjury by the Prosecutor*

Appellants argue that the prosecutor corrupted the trial process by coercing witnesses into testifying falsely against them. They allege that the prosecutor improperly manipulated the grand jury process by serving subpoenas to force witnesses to come into the U.S. Attorney's Office for repeated questioning without presenting them before the grand jury, and by paying them witness fees even though they had not testified before the grand jury. Through these tactics, appellants claim, the prosecutor intimidated and wore down the witnesses into giving false testimony to the grand jury that was favorable to the government. While this argument also figures in appellants' claim of *Brady* violations (discussed *infra*), appellants argue that the government's abuse of the grand jury process resulted in false grand jury testimony from Hugo Alemán—which the government then used to impeach Alemán when he would not implicate appellants at trial—in contravention of the government's due process obligations under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). For reasons that follow, we conclude that although the prosecutor's use of subpoenas and payment of fees intended for grand jury witnesses was improper, the trial court did not abuse its discretion in rejecting appellants' motions for new trial because the abuse did not lead to subornation of perjured testimony that was presented at trial by the prosecutor.

Appellants claim that the prosecutor issued grand jury subpoenas multiple times to Hugo Alemán in order to force him to appear at the U.S. Attorney's Office for questioning. Alemán initially told the prosecutor that he was drunk and saw nothing, but, appellants claim, the prosecu-

tor harassed and threatened Alemán into changing his story to one more favorable to the government by issuing repeated subpoenas requiring him to return to the U.S. Attorney's Office, but did not present Alemán before the grand jury until he agreed to implicate appellants. In support of this claim, appellants produced affidavits not only from Alemán, but also from others—Mayra Rivera, Blanca Buruca, Sandy Leonzo and Erica García—stating that they too were subpoenaed by the government multiple times and pressured to give testimony implicating appellants. When they refused to comply, the prosecutor did not present them before the grand jury.

At trial, Alemán reverted to his original story: that he had been drunk on the night in question. Although he did not deny *seeing* the assaults, he stated that he could not *remember* seeing them. When the prosecutor confronted him during direct examination with his grand jury testimony, Alemán affirmed having seen appellants participate in the assaults. Three years later—in his affidavit in support of appellants' motion for a new trial—Alemán recanted his grand jury testimony that he had reluctantly adopted at trial, reverting again to his original story. Alemán claimed in an affidavit that he had lied to the grand jury as a result of the prosecutor's coercive measures, that he had been drunk at the time of the assaults, did not see what happened, and had left in a taxi before the assaults occurred. The government filed an opposition to appellant's motion proffering an affidavit from the prosecutor attesting that the government had not unduly coerced Alemán.

During the post-trial hearing on the new trial motions, Alemán testified that he lied to the grand jury because he was "afraid . . . that they could put me in jail without

having done anything." When asked how he managed to testify with such detail about what he did and did not see, he said he used information he had overheard from conversations among the lawyers at the U.S. Attorney's Office, and in some instances simply made up the details. He also testified that his memory of the grand jury testimony was fuzzy because he had suffered a blow to his head shortly before the 2002 post-trial hearing, an injury which had required hospitalization.

The trial prosecutor, AUSA Asunción, testified at the post-trial hearing that his logbook showed that he had five appointments with Alemán, but that he remembered only two of those meetings consisted of substantive conversation about the assaults. According to the prosecutor, because he knew from other witnesses that Alemán had been on the scene, but had not been involved in the assaults,[18] he had urged Alemán to testify to the truth, but denied that he had threatened Alemán with prosecution or provided Alemán with details about the assaults. AUSA Asunción explained that he did not present Alemán to the grand jury the first time he was subpoenaed because he had good reason to think that Alemán was lying when he said he did not remember seeing the assaults. The prosecutor did not recall how many additional subpoenas he served on Alemán. At their next substantive conversation, Alemán told the prosecutor that he had seen part of the assault on Helm. It was at that point that the prosecutor presented Alemán before the grand jury.

■ The U.S. Court of Appeals for the District of Columbia "has recognized that the term 'grand jury subpoena' is in some respects a misnomer, because the grand jury itself does not decide whether to issue the subpoena; the prosecuting attorney

---

18. Neither José Pérez, Benítez, nor Rosa Gar- cía testified that Alemán was involved.

does." *Lopez v. Dep't of Justice*, 364 U.S.App. D.C. 274, 278, 393 F.3d 1345, 1349 (2005). As the court explained:

> The prosecutor may issue the subpoena without the knowledge of the grand jury, but his authority to do so is grounded in the grand jury investigation, not the prosecutor's own inquiry. Federal prosecutors have no authority to issue grand jury subpoenas independent of the grand jury.... [We] also noted that "a grand jury subpoena gets its name *from the intended use of the testimony.*"

*Id.* at 278–79, 393 F.3d at 1349–50 (quoting *Doe v. DiGenova*, 250 U.S.App.D.C. 274, 279 n. 11, 779 F.2d 74, 80 n. 11 (1985)).

In *Durbin v. United States*, 94 U.S.App. D.C. 415, 221 F.2d 520 (1954), the District of Columbia Circuit found an abuse of the subpoena power where the prosecutor caused a grand jury subpoena to be served, four times, requiring the person (later charged) to appear at the prosecutor's office on each occasion, without ever being presented to the grand jury. "Instead, appellant was taken each time to the office of the United States Attorney where he was questioned by the Assistant.... [T]he Assistant admitted that the reason he did not take appellant before the grand jury was because he was not satisfied with appellant's statement." *Id.* at 416, 221 F.2d at 522. The court concluded that the law did not support the use of the grand jury subpoena "as a compulsory administrative process of the United States Attorney's Office," and that "[i]t was clearly an improper use of the District Court's process for the Assistant United States Attorney to issue a grand jury subpoena for the purpose of conducting his own inquisition." *Id.* at 417, 221 F.2d at 522 (citing *In re*

*National Window Glass Workers*, 287 F. 219, 225 (N.D.Ohio 1922) ("The process by which witnesses are compelled to attend a grand jury investigation is the court's process and not the process of the grand jury, nor of the district attorney.")). The *Durbin* court further concluded that it was not a sufficient justification for the prosecutor to argue that he had a duty to be satisfied that the witness would testify truthfully before placing the witness before the grand jury. *See id.*[19] Following *Durbin*, the U.S. District Court for the District of Columbia has enjoined the U.S. Attorney from sending witnesses a "summons" or any other request to appear for questioning that is designed to look like a subpoena. *See United States v. Thomas*, 320 F.Supp. 527, 530 (D.D.C.1970).

Although we have not previously been presented with this issue, we note that the Superior Court has followed the D.C. Circuit's analysis, and held that "the grand jury subpoena cannot be used to compel attendance anywhere but at a grand jury proceeding." *In re Grand Jury Subpoenas to Witness X*, SP–2802–00, slip op. at 4–5, 7 (D.C.Super.Ct. Oct. 23, 2001) (King, C.J.) (citing *Durbin*, 94 U.S.App. D.C. at 417, 221 F.2d at 522, and *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971)).

In addition to the D.C. Circuit, other federal appellate courts have similarly held that it is improper for a prosecutor to use the subpoena power to secure a potential witness for investigatory questioning. *See United States v. Wadlington*, 233 F.3d 1067, 1075 (8th Cir.2000) (holding it to be an "improper use of grand jury subpoenas" for the prosecutor to have brought witnesses in from out of state a day ahead of their scheduled grand jury testimony in

---

**19.** Ultimately, the *Durbin* court reversed the conviction, not based on prosecutorial abuse of the subpoena power, but rather due to a fatal defect in the indictment. 94 U.S.App. D.C. at 416, 221 F.2d at 521–22.

order to question them extensively beforehand); *United States v. Villa–Chaparro,* 115 F.3d 797, 804 (10th Cir.1997) ("Undoubtedly, the government's practice of using the court's subpoena power to compel witnesses to attend *ex parte* interviews is improper. Courts have consistently interpreted FED.R.CRIM.P. 17(a) to permit the issuance of subpoenas only to compel attendance at formal proceedings such as hearings and trials."); *United States v. LaFuente,* 991 F.2d 1406, 1411 (8th Cir. 1993) ("The practice of using trial subpoenas to compel witnesses to attend pretrial conferences is improper under Rule 17 of the Federal Rules of Criminal Procedure" (citing several federal cases holding that subpoenas may only be issued to compel attendance at a formal proceeding, such as a grand jury)); *United States v. Elliott,* 849 F.2d 554, 557 (11th Cir.1988) ("The court's subpoena power may not ... be used by the United States Attorney's office as part of its own investigative process."); *United States v. DiGilio,* 538 F.2d 972, 985 (3d Cir.1976) (stating that grand jury subpoenas may not be issued to facilitate interrogation by prosecutor).

 We adopt the views of the D.C. Circuit[20] and other federal appellate courts that the use of subpoenas intended for grand jury witnesses for the purpose of prosecutorial investigation is improper. We note that it is also improper for the government to pay fees to witnesses called to the U.S. Attorney's Office solely for prosecutorial interrogation. Under 28 U.S.C. § 1821, witnesses in federal court are to be paid a fee only for attending court or a deposition. *Id.* at (a)(1). By statute, "[t]he fees ... to be paid any witness attending in a criminal case in the Superi-

or Court of the District of Columbia shall be the same as those paid to witnesses who attend before the United States District Court for the District of Columbia." D.C.Code § 15–714(a) (2001); *see* Super. Ct.Crim. R. 113(a) (providing fees for witness "attending Court or a deposition pursuant to any rule or order of a court"). Moreover, the regulations of the Department of Justice specifically prohibit fees paid for "information or investigative proceedings conducted by a prosecuting attorney for the purpose of determining whether information or charge should be made in a particular case." 28 C.F.R. § 21.1(c); *see id.* at § 21.4.

 We do not mean to imply that prosecutors may not interview witnesses prior to their appearance before a grand jury in order to prepare the witness for giving testimony, provided there is no intimidation or abuse of the grand jury subpoena process for the purpose of conducting discovery. *See In re Grand Jury Proceedings (PHE, Inc.),* 640 F.Supp. 149, 153 (E.D.N.C.1986) (holding it proper for the U.S. Attorney to " 'interview witnesses before taking them to the grand jury in order to eliminate unnecessary material before the grand jury and save time of the grand jurors' " (quoting *United States v. Mandel,* 415 F.Supp. 1033, 1039 (D.Md.1976) (holding prosecutor did not abuse process when he subpoenaed five witnesses for interviews, but did not have them testify before the grand jury because their testimony was cumulative), *rev'd on other grounds,* 591 F.2d 1347 (4th Cir.1979))). While the prosecutor may organize the testimony of potential witnesses in order to present the government's case to the grand jury in an order-

---

**20.** As the Superior Court of the District of Columbia has the same subpoena power as a federal district court, we look to federal precedents for guidance. *See Christian v. United*

*States,* 394 A.2d 1, 42–43 (D.C.1978) (citing D.C.Code § 11–1903 (1973) and Super. Ct. Civ. R. 6).

ly and comprehensible manner and need not present all potential witnesses to the grand jury, "[t]he prosecutor may *not* conduct [preliminary] interviews for an improper purpose such as to harass witnesses or as a means to conduct criminal or civil discovery." *In re Grand Jury Proceedings (PHE, Inc.),* 640 F.Supp. at 153 (citing *United States v. (Under Seal),* 714 F.2d 347, 349 (4th Cir.)).

█ There was evidence in this case that the prosecutor caused several subpoenas to be served on Alemán, and conducted at least five interviews before presenting him to the grand jury.[21] The prosecutor's repeated use of the subpoena power in this case would therefore be considered abusive.[22] Moreover, Alemán testified that he received payments of "20 or 40 dollars" for each day he came to the U.S. Attorney's Office.[23] In denying appellants' motions for new trial, the court assumed that Alemán had been intimidated by the repeated subpoenas, but concluded that appellants failed to show any significant prejudice to them caused by any abuse of the subpoena power by the prosecutor:

> Since the government submitted no affidavits contradicting the allegations of any witness other than Hugo Aleman, the Court accepts as true the witness affidavits about their contacts with the prosecutor. Of all the witnesses alleging that the prosecutor pressured witnesses to lie and that the prosecutor misused the subpoena power, no one

except Hugo Aleman claims to have actually lied at trial. The only corruption of the trial specifically alleged is subornation of Aleman's alleged perjury, which the defendants have utterly failed to prove. Thus, the defendants show no nexus between the intimidation and the evidence at trial.

The trial court's conclusion that there was "no nexus" was based on its determination that Alemán "was telling the truth before the grand jury" and that his "current claim that he made up the details of his grand jury testimony is incredible." The court based its assessment on finding that Alemán's grand jury testimony had key indicia of truthfulness, specifically that Alemán (1) candidly admitted that he had been drinking; (2) saw some details but not others; (3) did not realize that night that he had witnessed a murder because he left before the attack was over; and (4) testified to seeing some of his acquaintances involved in the attack, but not others. The trial court noted that Alemán's testimony did not unequivocally help the government's case (for example, he contradicted other government witnesses by saying that only appellant Pérez had been involved in the assault on the homeless man), yet at the same time his was the only testimony that Bonilla actually hit Helm, a fact to which no other witness had attested. Because Alemán's grand jury testimony did not simply parrot what others had said, or fully implicate everyone the government sought to charge, the trial court did not credit his blanket recantation made three

---

**21.** During the post-conviction proceeding, appellants sought from the government "documents summoning witnesses for interviews," and "[w]itness payment certificates[.]" The trial court denied the motion, accepting the government's explanation that the requested materials "[could] not be found but [the government] produced the prosecutor's notes and calendar indicating the frequency of relevant witness interviews."

**22.** *See also* District of Columbia Bar, Ethics Opinion No. 32 (March 29, 1977) (warning against abuse of the subpoena power).

**23.** AUSA Asunción testified that, although he could not specifically recall, "[he thought] in all likelihood if a witness came in, we gave them a voucher."

years after trial, following a recent serious head injury. Indeed, the trial court found his blanket recantation "nonsensical," because "[t]o almost every question about whether a particular statement to the grand jury was true or false, he answered that it was false even when his testimony had been that he had not seen something." Specifically, when Alemán was asked if his grand jury testimony was true—that he could not see whether appellant Pérez attacked the homeless man—he simply said it was false (implying that he could see Pérez attacking the homeless man, although he also testified that he could not implicate any of the appellants in the assaults). The trial court found that Alemán had been a reluctant government witness who was pressured to testify before the grand jury, but not to lie. As a result, the trial court denied the motion for a new trial based on Alemán's recantation.

■■■■■ "We will reverse the court's ruling on the credibility of the trial testimony and recantation only if it is wholly unsupported by the evidence." *Godfrey v. United States,* 454 A.2d 293, 301 (D.C.1982). This court therefore reviews the trial court's findings only for clear error. Moreover, "only if the court credits the recantation, must it then apply one of the tests traditionally used to evaluate jury impact ..." sitting as a "thirteenth juror."[24] *Id.* at 299. Like the trial court in *Godfrey,* the trial court here reasonably

based its rejection of Alemán's recantation on detailed factual findings after seeing the witness testify at trial and at the post-trial hearing. "Any 'factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous.'" *Hill v. United States,* 664 A.2d 347, 353 n. 10 (D.C.1995) (quoting *United States v. McNeal,* 955 F.2d 1067, 1072 (6th Cir.1992)).

At its heart, appellants' argument assumes, without actually proving, that the truth lies in Alemán's original story to the prosecutor that he saw nothing of the events in question, or at least could not remember what he saw because he was drunk. The only evidence appellants have offered is Alemán's belated recantation and his claim, corroborated by affidavits from others,[25] that the government pressured him and others into testifying falsely. The trial court, however, carefully weighed this evidence and evaluated the credibility of the witness. We cannot say, therefore, that on this record it was clearly erroneous for the trial court to have credited Alemán's grand jury testimony over his recantation.

Moreover, it does not necessarily follow, as appellants would have us conclude, that because Alemán testified under pressure that he must have lied. Appellants ignore that Alemán had as much reason, if not

24. The standard to be applied by the trial judge is:
 whether (1) the recantation "would *probably* produce an acquittal in the event of a retrial," *Nowlin v. United States,* 382 A.2d 9, 14 n. 7 (1978), or, less conclusively, (2) "without it the jury *might* have reached a different conclusion." *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928). *Godfrey,* 454 A.2d at 299–300.

25. As the trial court accepted Alemán's assertion that he had been pressured to testify by

means of multiple subpoenas, there was no prejudice to appellants from the absence of live testimony at the post-trial hearing from the other affiants on this point. All of these affiants attested that they were not present at the assaults, so they could not offer any eyewitness testimony as to whether Alemán was in a position to see the events. Moreover, of all the witnesses who complained of prosecutorial intimidation and abuse of process, Alemán was the only one who testified at trial for the government.

more, to fear from their retaliation as from the prosecutor.[26] It is therefore far from obvious that Alemán lied before the grand jury and at trial, but told the truth in his belated recantation.

Finally, we doubt that any abuse of process tainted appellants' trial. Defense counsel were able to present evidence to the jury of the prosecutor's pressure tactics. Just as she claimed in her 2002 affidavit in support of the motions for a new trial, Rivera testified at trial that the prosecutor had pressured her into lying, had threatened her with jail and the loss of her child and her job, and that a detective had "screamed" at her. Gilfredo López also testified that government witness Benítez told him that the government had pressured him into saying falsely that appellant Robles–Benevides gave Velásquez the knife. Finally, although Alemán's grand jury testimony, which was admitted into evidence, did not disclose that he came in for repeated questioning under subpoena, it did show the jury that he had never been firm about his eyewitness testimony; rather Alemán had always wavered between admitting that he did see the assaults or backtracking that he did not see the crime because he was drunk. Therefore, given that the jury saw that Alemán was impeached by the prosecutor with his grand jury testimony and heard from Rivera about the threats she received from the prosecutor, neither Alemán's post-trial testimony nor the affidavits filed with the motion for a new trial disclosed anything significantly new about prosecutorial pressure that had not already been presented to the jury at trial. Appellants were therefore not prejudiced by counsel's lack of knowledge at the time of trial that the government had repeatedly subpoenaed

Alemán. Because appellants have failed to show abuse of process on the part of the prosecutor that actually suborned perjury against them, or otherwise prejudiced their ability to present a defense at trial, neither reversal of their convictions nor a new trial is warranted. *See Wadlington,* 233 F.3d at 1075 (declining to reverse for abuse of subpoena power because there was no resulting prejudice).

B. *Brady Disclosure Obligation (Appeal Nos. 02–CO–1242; 02–CO–1205; 02–CO–1231; 02–CO–1385)*

Appellants Bonilla, Villatoro and Robles–Benevides claim that the government violated their due process rights by failing to turn over in a timely manner all exculpatory information in its possession. Specifically, they complain that the government failed to disclose before trial: (1) Alemán's conflicting statements to the prosecutor; (2) Alemán's statements to the grand jury that he was too drunk to recall the events on the night of March 14; (3) statements from Sandy Leonzo and Mayra Rivera that Rosa García had in fact drunk a large amount of alcohol that evening and had left with them in a cab before the assaults occurred; and (4) Rosa García's false statements to the prosecutor about her immigration status. In addition, Pérez claims that the prosecutor never disclosed a pending child neglect proceeding against Rosa García that would have biased her in favor of the government.

 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83

---

**26.** At the very least, Alemán knew that appellants had been involved in a brutal murder. Both Benítez and Rosa García also testified at trial that they had been threatened with their lives should they testify against appellants.

S.Ct. 1194, 10 L.Ed.2d 215 (1963). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "[T]here is never a real '*Brady* violation' [however] unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281, 119 S.Ct. 1936.

1. *Hugo Alemán's conflicting statements and grand jury testimony*

Appellants contend that the government unlawfully withheld exculpatory as well as impeaching evidence when it failed to turn over, prior to trial, Hugo Alemán's statements to the grand jury that because he had been drunk at the time, he could not remember seeing any of the assaults. After trial had started, but just before Alemán took the stand to testify, the government gave defense counsel a copy of the transcript of Alemán's grand jury testimony, which showed that Alemán had told the grand jury that at two different meetings, including when he first spoke with the prosecutor, he had said that he could not remember seeing anything because he was drunk. He also told the grand jury, however, that he had been lying when he had claimed no memory of the assaults. Asserting that he was now telling the truth, Alemán testified to the grand jury that he saw appellants assault Helm and the homeless man.

At trial, during direct examination, the government introduced Alemán's grand jury testimony inculpating appellants after he reverted to his original story that he could not remember anything about the assaults. Following the government's direct examination, Robles–Benevides requested and was granted a recess to review the grand jury transcript he had just received. After a twenty-five minute recess, Bonilla's counsel cross-examined Alemán, followed by counsel for Villatoro (no other counsel chose to cross-examine Alemán). On cross-examination, Alemán repeatedly said that he had been drinking that evening, and that his memory of the events was impaired. Neither defense counsel, however, cross-examined him regarding his prior testimony before the grand jury when he initially denied any knowledge of the assaults, and then repudiated that claim. Instead, Bonilla's counsel was able to elicit testimony from Alemán that excluded Bonilla from the assault on Helm. On re-direct examination, the prosecutor brought out Alemán's grand jury testimony that he had originally told prosecutors that he had been too drunk and could not remember the assaults.

Appellants argue that the government should have disclosed the grand jury transcript before trial, including the information about Alemán's prior statements claiming he could not remember the assault, and that this belated disclosure right before Alemán testified at trial left counsel too little time to investigate the facts and prepare their cross-examination of the witness.

 We are repeatedly confronted with complaints of tardy disclosure of exculpatory material, and we cannot emphasize too strongly that, unlike the obligation under the *Jencks* Act, 18 U.S.C. § 3500 (2000),[27] to turn over to the defense prior statements of a government witness before that witness testifies on direct examina-

---

**27.** The *Jencks* Act has been implemented in Super. Ct.Crim. R. 26.2.

tion, *see id.* at (b), for purposes of impeachment, *see Jencks v. United States,* 353 U.S. 657, 668–69, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), the due process obligation under *Brady* to disclose exculpatory information is for the purpose of allowing defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense. *See Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) ("[I]t is now well settled that the prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case ...." (internal quotation marks and citation omitted)). This necessarily implies timely, pretrial disclosure. *See Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) ("[A] prosecutor's timely disclosure obligation with respect to *Brady* material cannot be overemphasized.") (quoting *United States v. Starusko,* 729 F.2d 256, 261 (3d Cir.1984)). "Accordingly, this court has rejected any notion that disclosure in accordance with the Jencks Act satisfies the prosecutor's duty of seasonable disclosure under *Brady,* or that if such disclosure is made, the burden may then be shifted to the defendant, under pain of waiver, to request a continuance or similar remedy." *Edelen,* 627 A.2d at 970. *See also James v. United States,* 580 A.2d 636, 643 (D.C.1990) ("If we were to impose upon defense counsel the obligation, every time Jencks material is disclosed ... to evaluate—or to request a continuance in order to evaluate—the material's relevance not only to the witness who is testifying, but also to every witness who has previously testified, the result would be that a prosecutor's *Brady* obligations would extend no further than the requirements of the Jencks Act.").

There is no question here that Alemán's grand jury testimony should have been disclosed before trial. On this record, however, appellants "ha[ve] not demonstrated any prejudice by the delay in receiving [the] statement." *Bellanger v. United States,* 548 A.2d 501, 503 (D.C. 1988) (no *Brady* violation even though government disclosed *Brady* material after the beginning of trial, where there was no prejudice). Despite the delay in receiving the information, defense counsel was able to use the evidence to impeach Alemán's credibility and elicit exculpating testimony, at least with regard to Bonilla. As in *United States v. Ingraldi,* 793 F.2d 408, 412 (1st Cir.1986) (cited with approval in *Bellanger,* 548 A.2d at 504 n. 6), "[t]he record shows that defense counsel conducted an extremely effective cross-examination of [the witness], that he did succeed in using the tardily disclosed information to impugn [the witness's] credibility, and that there were so many other grounds for attacking [the witness's] credibility, which defense counsel exploited fully, that the [*Brady* material] was of minimal impact." Further undermining any prejudice, the prosecution itself brought out on redirect examination Alemán's prior statements that he could not remember the assaults, albeit in an apparent effort to salvage Alemán's credibility by showing his candor and honesty before the grand jury.[28] Finally, after having read the grand jury transcript, defense counsel did not indicate the need for additional time beyond the brief recess the court allowed.

Bonilla argues that he was prejudiced not merely by the untimely disclosure of the grand jury transcript, but also because the government never disclosed that Ale-

---

**28.** No defense counsel moved for mistrial, or sought to recall Alemán later during the re- maining week of trial.

mán had been subpoenaed multiple times. He claims that this information provided a separate ground for impeachment, and would have shown that Alemán was pressured by the prosecutor into changing his story and giving incriminating testimony to the grand jury. The grand jury transcript, however, put Bonilla and all of the other appellants on notice that Alemán had met with the prosecutor several times before he appeared before the grand jury, and that on several occasions he had denied remembering anything of the assaults. The transcript therefore alerted appellants not only to Alemán's initial statements denying any knowledge of the assaults, but also to the fact that he had done so over the course of several interviews with the prosecutor. From this, counsel could have inferred that (or questioned whether) Alemán's meetings with the prosecutor had not been voluntary, but pursuant to subpoena. The grand jury transcript could therefore have been used to argue that Alemán did not readily volunteer his incriminating grand jury testimony on his own initiative, but did so only under pressure from the prosecutor. This point was implicitly made at trial, where rather than directly testifying about appellants' participation in the attacks, Alemán reluctantly assented to his grand jury testimony when the prosecutor confronted him with it, after he claimed he could not remember the assaults. Since it was obvious from his testimony—both at trial and before the grand jury—that Alemán had initially resisted the government's persistent questioning regarding his knowledge of the assaults, additional information that Alemán had been repeatedly subpoenaed would have added too little to his impeachment for us to conclude that "there is a reasonable probability that, had the [multiple subpoenas] been disclosed to the defense, the result of the proceeding would have been different." *United States v.*

*Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Moreover, as discussed previously, the jury was made aware that the government's investigation had been heavy-handed: Mayra Rivera testified that the government had called her into the prosecutor's office twice for questioning and threatened her, and López testified that Benítez told him that he had been pressured to falsely incriminate Robles–Benevides with respect to the knife. Defense counsel did not think it necessary to ask for a halt to the trial to investigate the issue and recall Alemán as a witness to testify regarding the prosecutor's pressuring him to incriminate appellants. Therefore, although we emphasize that the information should have been disclosed before trial, because there was no material prejudice to the defense by the government's delay in disclosing the transcript of Alemán's grand jury testimony, nor by the government's failure to disclose that Alemán had been subject to multiple subpoenas, we conclude that there was no *Brady* violation requiring reversal.

### 2. *Rosa García—Impeachment witnesses*

On the third day of trial, appellant Villatoro's counsel announced that the defense had "discovered yesterday" two witnesses, Sandy Leonzo and Mayra Rivera, who could impeach the testimony of government witness Rosa García by testifying that García had not been present during the assaults but had been with them instead. Villatoro represented that the government had known of these witnesses, but had not informed defense counsel about them before trial. The court denied the motion for a mistrial based on *Brady,* but encouraged counsel to make use of the witnesses. The following day, Bonilla called Mayra Rivera to the stand. She testified that Rosa García left the night-

club with her, Blanca Buruca, Sandy Leonzo and José Guevara. Rivera said that contrary to her testimony at trial, García had had about four glasses of liquor that night, and that they had all left the nightclub together in a taxi before the attacks occurred and saw nothing of them. On cross-examination, Rivera admitted that she had told the prosecutor in a pretrial interview that she had seen the attack, but explained that she did so only because the prosecutor pressured her.

 Any violation of the government's duty to disclose pretrial exculpating information to the defense was cured here by defense counsel's ability to call Rivera at trial and elicit through her testimony the very evidence that appellants seek to introduce at a retrial: that Rosa García had been drinking, that she left in a taxi before the attacks took place, and that prosecutors had pressured witnesses into saying otherwise. Moreover, in the government's opposition to Villatoro's § 23–110 claim of ineffective assistance of counsel (discussed *infra*), Villatoro's trial counsel provided an affidavit attesting that all defense counsel met with Leonzo, Rivera, and Buruca during the trial and knew that some of the women's claims conflicted with García's testimony. Counsel had then found out that some of them had given inconsistent statements to the police and had even identified some of the appellants as having participated in the attacks from police photographs. As a result, Villatoro's defense counsel decided not to call the women as witnesses. Salamanca's counsel had decided not to do so because he also found them unbelievable. Therefore, it seems unlikely that earlier disclosure by the government of these witnesses would have made a difference to defense strategy.

Even if we were to assume that with timely and complete disclosure by the government about the potential witnesses, the defense might have persuaded the jury to discount the testimony of García concerning the assaults outside the nightclub, the government's case remained compelling. There was the testimony of several eyewitnesses: coconspirator Benítez, bystander José Pérez (whose credibility appellants do not contest), and, in the case of Robles–Benevides, the identification by one of the victims of the attacks—Hallner. José Pérez corroborated every one of Benítez's statements incriminating his coconspirators, with the exception of Benítez's implication that Salamanca had beaten the homeless man. The only convictions that rely exclusively on García's testimony are Salamanca's convictions for threatening and assaulting Rosa García and for obstruction of justice.

The additional witnesses would not have added much to the defense case. That witnesses were pressured by the government into testifying falsely against appellants is largely a credibility issue that appellants were able to put before the jury through the testimony of Mayra Rivera. García was generally impeached by Rivera's testimony that she had been drinking alcohol that night and had left before the assaults took place, but that impeachment did not directly undermine García's testimony that Salamanca assaulted and threatened her the following day. More to the point was Stanislao Robles–Fuentes, who gave a benign account of Salamanca's encounter with García. Unlike Alemán, however, García had never changed her story or recanted her testimony. In sum, the government's evidence against appellants regarding the assaults outside the nightclub was strong, even apart from the testimony of García. Regarding García's testimony against Salamanca on obstruction of justice and related charges, he had a full opportunity to put before the jury the evidence he now seeks to introduce

again at a new trial. Because appellants have not shown a reasonable probability of a different outcome, we conclude that there is no *Brady* violation requiring reversal.

### 3. *Rosa García's false statements and bias (immigration status and child neglect proceeding)*

While these appeals were pending oral argument, the government disclosed to defense counsel that government witness Rosa García had made false statements regarding her immigration status to the prosecutor while being considered for the witness protection program prior to trial. We ordered a partial remand to the trial court to permit appellants affected by the belated disclosure to file any motions they deemed appropriate under D.C.Code § 23–110. *See* Order dated February 16, 2005.[29] All appellants, except Robles–Benevides, filed a motion for new trial alleging *Brady* violations as a result of the government's failure to promptly disclose García's false statements about her immigration status. The trial court denied the motions, and appellants filed timely appeals that we consolidated with the pending appeals.[30]

On remand, appellants Bonilla, Salamanca, and Villatoro argued that had they known García made false representations to the prosecutor regarding her immigra-

tion status, they would have used that information to impeach her testimony. On a different note, appellant Pérez argued that the government violated *Brady* by "actively conceal[ing]" a neglect proceeding involving García and her children.

The trial court held an evidentiary hearing on appellants' individual motions for new trial. Three witnesses testified: Rosa García, the prosecutor, and the witness security specialist at the U.S. Attorney's Office who screened García for the witness protection program.

The court found that García's mother brought her to the United States when she was nine years old. Her mother gave her a U.S. social security number and a passport from El Salvador, and told García that she had applied for a "green card" on her behalf. García never received a green card and knew that she was in the country illegally. García, however, testified that "the matter was rarely on her mind," and that she "did not fear deportation." "She did not ask for and had no hope or expectation of special treatment either at the time of her initial statements to the police and the grand jury or at trial." Indeed, the prosecutor testified that García had never asked him for help to adjust her immigration status.[31] García testified that the reason she was a witness was "to make sure that her boyfriend José Benítez did

---

29. The per curiam order reads, in relevant part:

> FURTHER ORDERED that the motion for partial remand is granted only to the extent that the trial court is directed to consider ... the merits of any § 23–110 motion that appellants may file ... that address *Brady* claims related to the government's witness, [Rosa] García, in light of information recently disclosed by the government. If the motion in the trial court is denied, review of that denial may be sought by filing a separate notice of appeal....

30. Appeals Nos. 06–CO–341 (Pérez); –1164 (Bonilla); –1563 (Salamanca); and –1170 (Villatoro).

31. Five years later, in 2003, the government sought García's assistance in prosecuting Navarette, see *supra* note 4. The prosecutor in that case, AUSA Stephen Gripkey, offered to help García by applying for an "S Visa" and preparing a letter of immunity concerning her immigration issues. When Navarette pled guilty prior to jury selection, the letter of immunity became moot but AUSA Gripkey continued the process of applying for an "S Visa".

not take the blame alone," and because she would want eyewitnesses to come forward if a similar misfortune befell her children.

García contacted the police on March 15, 1998, the same day that she had seen the murder and other assaults. She gave a detailed statement that "[s]he had seen her boyfriend Benítez ... and others hitting and kicking the decedent but knew that Velásquez ... and Douglas Ventura were armed and had stabbed the decedent." Just two days later, on March 17, García testified before the grand jury.

Initially, García refused to be sheltered in the witness protection program when she first reported the crime and testified before the grand jury in March. She later changed her mind in May, when gang members threatened her life if she testified at trial (a separate incident that was not part of this prosecution). García's illegal immigration status came to light when a detective assisting in the witness protection program contacted Immigration and Naturalization Services ("INS"). When the detective confronted García with the information, García admitted that she did not have a "green card." The prosecutor then contacted INS to find out if García was on the deportation detainer list. Upon learning that she was not, the prosecutor arranged to have García admitted to the witness protection program. The prosecutor testified that he did not ask INS not to deport or otherwise give special treatment to García. He also did not question the validity of her social security number or passport. Although the prosecutor disclosed to appellants that García had been placed in the witness protection program and of its financial benefits, he never disclosed information about her immigration status.

García testified that she first wondered whether her immigration status would become an issue during trial when she looked at Salamanca, who was related to her by marriage and knew that she was in the country illegally. But that concern, she testified, did not affect her testimony.

### a. Bonilla and Villatoro

Appellants Bonilla and Villatoro argue that García's illegal immigration status and her false statements to the prosecutor about her status were material *Brady* evidence, and that because the information was not disclosed by the prosecutor, they are entitled to a new trial with such evidence. We disagree with appellants for reasons that follow, and affirm the trial court's denial of appellants' § 23–110 motions requesting new trials.

■ We agree with the trial court's assessment that, even assuming the government breached its obligation to disclose García's illegal immigration status, there is no reasonable probability that disclosing such information would have so undermined her testimony as to have produced a different outcome at trial. *See Strickler*, 527 U.S. at 281, 119 S.Ct. 1936 (noting that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"). The trial court credited García's testimony that her immigration status was "rarely on her mind," and that she did not fear deportation. It was not until months had passed after she had given a police report and sworn testimony to the grand jury that her immigration status even became an issue. When the matter came to light, García readily admitted that she was in the country illegally, which in the end did not prevent her from entering the witness protection program.

The additional impeachment for bias based on her immigration status would

have been marginal because García testified at the evidentiary hearing—and was found credible by the trial court—that she neither expected nor sought help from the government about her immigration status. *See Brooks v. United States*, 396 A.2d 200, 205 (D.C.1978) ("Given the plethora of factors that could have motivated [the witness] other than an irreverence for truth and veracity, we cannot say that the judge below was incorrect in finding that the jury's verdict would not have been affected by such a line of questioning designed to impeach [the witness's] testimony."). And even though García's lies to the prosecutor about her immigration status could impeach her credibility generally, *cf. Portillo v. United States*, 609 A.2d 687, 690 (D.C.1992) ("the prosecutor [was] wrong . . . . [to] impl[y] that anyone who—for whatever reason—has crossed our borders in violation of the government's immigration procedures should not be believed"), as the trial court observed, García's "trial testimony had indicia of reliability" and "was tested by substantial cross-examination, impeachment and contradiction," including attacks to her ability to observe the assaults (she admitted she could not see well) and her motivation to protect her boyfriend, Benítez.

Finally, we agree with the trial court that Bonilla's and Villatoro's convictions were supported by compelling evidence independent of Rosa García's testimony. García testified that she saw Bonilla driving the car carrying the group of men that attacked Helm. But there were four other witnesses who also testified that Bonilla was driving the car: Alemán, Benítez, Hallner, and José Pérez. Most importantly, Bonilla, himself, admitted that he drove his friends to the scene of the stabbing, got out of the car to close the door, saw Velásquez stab Helm, and then drove Velásquez to a gambling place afterwards. The "significant government evidence" in-

criminating Bonilla, according to the trial court, came from Alemán, who acknowledged at trial that he testified before the grand jury that Bonilla hit Helm in the face before he got back into the car.

As for Villatoro, García testified that she saw him arguing with the homeless man and later saw him assaulting Helm. But several other witnesses also testified to the same facts. Benítez, Bonilla and Salamanca identified Villatoro as the person who fought with the homeless man. Benítez also testified that Villatoro was one of the men who threw rocks at the car that had stopped to help the homeless man. Alemán and Bonilla saw Villatoro chase Helm; and Alemán and José Pérez saw him hit Helm.

For these reasons, we agree with the trial court that introduction of additional evidence to further impeach García's testimony would not likely have led to a different outcome with respect to Bonilla and Villatoro, and affirm its denial of their motions for new trial on this basis.

#### b. *Salamanca*

As the sole witness, García was crucial to the government's case against Salamanca for obstruction of justice, threats and assault. Initially, when she gave a detailed statement of what she had seen earlier in the day, García did not tell the police on March 15 that Salamanca had choked her and threatened her to not talk to the police. It was two days later, on March 17, that García reported Salamanca's threats. The trial court recognized that "[t]hat delay supported an inference of fabrication. . . ." Thus, the trial court noted, Salamanca had been given ample opportunity at trial to cross-examine García about the delay and her possible motives to falsify her testimony, most prominent being "[h]er . . . bias . . . to help her

boyfriend ... Benítez, who had already been arrested."

Even though Salamanca tried to impeach García, at trial he himself partly corroborated García's testimony by admitting that he had confronted her on March 15, but it was not to threaten her about the assaults but because she was trying to break up his marriage.[32] A neighbor of Salamanca, Stanislao Robles–Fuentes— who was impeached by his relation to Robles–Benevides, see *supra*, note 14—testified that although he saw García and Salamanca talking from "a distance" and could not hear them, he did not see Salamanca touch García.

After hearing García's testimony at trial and in the hearing after this court's remand, the trial court found that she did not fabricate her trial testimony against Salamanca in order to curry favor with the government in order to obtain help with her immigration status. We defer to the trial court's credibility determination, which, as we discussed earlier, is well-supported by the record. Although García did not immediately tell the police that Salamanca had threatened and assaulted her, as she did concerning the assaults outside the nightclub she had seen earlier that morning, she did give sworn testimony to that effect to the grand jury only two days later, on March 17. It was not until May, however, that questions about her immigration status surfaced—and, as it turned out, her status did not preclude her from obtaining protection as a witness. Further, García did not seek help from the government regarding her uncertain immigration status; and neither her report to the police, nor her sworn testimony to the grand jury and at trial was used as leverage to secure her status. Nor did the government offer to help her in this re-

spect while the prosecution was ongoing. "Indeed," the trial court noted, "[b]y the time her illegal status was discovered so that she *might* have a motive to curry favor with the government, she had already told the Grand Jury in sworn detail ... about ... Salamanca's assault and attempt to intimidate her." Her version of what happened did not waver. On this record, the trial court's finding that García was not motivated to curry favor with the government is not clearly erroneous.

Moreover, we agree with the trial court that there was no reasonable probability of a different outcome, even if the government had disclosed García's immigration status and her false statements to the prosecutor. Further impeachment based on her immigration status (she had already been impeached for bias much more forcefully with her relationship with Benítez, who had pleaded guilty and was awaiting sentencing at trial) would not have materially altered the jury's rejection of Salamanca's explanation—that he only cursed at García—and its ultimate finding that Salamanca assaulted and threatened García to prevent her from cooperating with the police as an eyewitness to the assaults.

### c. *Pérez*

■ Pérez claims that the government should have disclosed that there was a pending neglect proceeding involving Rosa García that could have been used to impeach her for bias in favor of the government. The trial court denied Pérez's motion for new trial explaining that because García's testimony did not incriminate him, impeachment of her testimony would not have had any effect on his conviction. The government's case against Pérez was based on four eyewitnesses who testified

---

**32.** Salamanca explained that he merely cursed at García: "I like cussed her out, ... telling her, hey, why you such a bitch? Why you trying to break us up, me and my girl?"

about his participation in the assaults of the homeless man and Helm: Alemán (in testimony to the grand jury that was admitted at trial) and Bonilla saw him beat the homeless man; Alemán, Benítez and Bonilla saw him chase Helm; Alemán, Benítez, and José Pérez saw him punch and kick Helm. The trial court found that García's testimony, in contrast, "was minimal and not incriminatory": she merely saw Pérez in the area with Benítez, and testified that Pérez and his brother stopped Salamanca from choking her when Salamanca threatened her later that day.

Although we have recognized that evidence of a pending child neglect proceeding is relevant to a witness's bias, *see Scott v. United States,* 953 A.2d 1082, 1091 (D.C. 2008), it was not relevant here to Pérez's convictions. Since Pérez was not charged with any crime involving the assault on García and her testimony did not directly incriminate Pérez in the attacks on the homeless man or Helm, we agree with the trial court that he is not entitled to a new trial.[33]

### III. Admission of Codefendant's Hearsay Statements

Robles–Benevides argues that the admission of hearsay statements made by Bonilla violated his Sixth Amendment right to confrontation and was not supported by an exception to the hearsay rule.[34]

In order to show that Bonilla was not just a bystander but a willing participant in the assaults, the government sought to prove he knew that two of his passengers,

Velásquez and Ventura, were armed when they entered his car. The government asked to introduce, in its case-in-chief, a transcript of a redacted version of Bonilla's videotaped interview with the police in which he acknowledged knowing that the two men had knives when they got into his car. The trial court denied the government's motion, concluding that either Bonilla's trial would have to be severed, or the government would have to further redact the transcript to avoid incriminating any of the codefendants.[35] The government chose to make further redactions from the hour-long interview, down to a two-to-three minute segment. The court accepted the redacted transcript as a statement against Bonilla's penal interest, noting that "[the prosecutor] seems to have eliminated everything that was of concern...."

The day before the tape was to be played for the jury, counsel for Robles–Benevides expressed concern that Bonilla's ambiguous use of the pronoun "they"—when he said that "they" had knives—would allow the jury to infer that Bonilla was referring not only to Velásquez and Ventura, but also to Robles–Benevides, who was a passenger in the car. When the prosecutor indicated that later in the tape Bonilla clarified that "they" referred to Velásquez and Ventura, counsel withdrew his objection, and the redacted statement was admitted into evidence.[36] The court gave a limiting instruction to the jury that Bonilla's statement could only constitute evidence against him, and not against any other defendant.

---

**33.** Pérez is the only appellant to raise this claim.

**34.** In his brief, Villatoro incorporates this argument by reference.

**35.** Neither Velásquez nor Ventura were defendants in this trial, but Robles–Benevides

and Salamanca were passengers in Bonilla's car.

**36.** The prosecutor told the court: "What won't be redacted, Your Honor, is on Page 23. 'Who had the knife getting into the car? Douglas did along with Catinga [Velásquez]. They were carrying them.'"

 It is clear that if an out-of-court statement is "testimonial"—such as a confession to the police—it is inadmissible to prove the guilt of a defendant even if it comes within a recognized hearsay exception, absent an opportunity to cross-examine the declarant either at trial or at some prior proceeding. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *see also Morten v. United States*, 856 A.2d 595, 600 (D.C.2004). Bonilla's statements to the police are clearly testimonial. *See Crawford*, 541 U.S. at 53, 124 S.Ct. 1354. The Sixth Amendment, however, does not bar the admission of the redacted tape introduced during the government's case-in-chief because, as all parties agreed at the time, those statements did not implicate Robles–Benevides in the crime. *See Plater v. United States*, 745 A.2d 953, 961 (D.C.2000) (holding that defendant's out-of-court statement does not violate codefendants' Sixth Amendment rights when it omits any facially incriminating references to the codefendants).

 Here, Bonilla was available for cross-examination when he took the stand in his own defense. Counsel for Robles–Benevides cross-examined Bonilla and elicited testimony that Bonilla did not hear any conversation in the car about knives, laying the groundwork, presumably, for

later argument that Robles–Benevides similarly would not have overheard anything about knives while he was a passenger in the car. When the prosecutor then cross-examined Bonilla, however, he used portions of the *unredacted* transcript to refresh Bonilla's recollection and to impeach him. Robles–Benevides complains that introduction of Bonilla's use of the pronoun "they" in the unredacted portion of the transcript with which he was impeached implicated Robles–Benevides, who had gotten into his car outside the nightclub.[37]

 The Sixth Amendment did not bar the government's use of the unredacted transcript of the tape to cross-examine Bonilla, because the government used it only after Bonilla had taken the stand and he was available for cross-examination by the defendants. As the Supreme Court reaffirmed in *Crawford*,

> when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. *See California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is therefore irrelevant that the reliability of some out-of-court statements " 'cannot be replicated, even if the declarant testifies to the same matters in court.' " .... The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.

---

**37.** Prosecutor: Well, let me put it to you this way. Page 21. [quoting from the transcript of the statement to police:]

Detective Garvey: "When the two black guys started running, did anybody have a knife then?"
And your [Bonilla's] response: "When the two black guys ran off, they went and got their knives. I think *they* had their knives when *they* got in my car."

Did you say that?
Bonilla: I said that because, presumably in the discotheque *they* didn't have their knives. And then *they* asked me for a ride, so *they* must have had the knives hidden some place.
(emphasis added).

541 U.S. at 59 n. 9, 124 S.Ct. 1354 (citations omitted). Since Bonilla was available for cross-examination, and was in fact cross-examined by counsel for Robles–Benevides, the Sixth Amendment did not bar admission of his out-of-court testimonial statements. "The Constitution as construed in *Bruton* ... is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination." *Ellsworth v. United States*, 300 A.2d 456, 458 (D.C.1973) (quoting *Nelson v. O'Neil*, 402 U.S. 622, 627, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971)). Although Bonilla was available, Robles–Benevides did not recross-examine Bonilla to clarify or rehabilitate his testimony following the government's cross-examination. Because there was an opportunity for cross-examination, appellants' Sixth Amendment right to confrontation was honored.[38]

 Even where there is no Confrontation Clause concern, a hearsay statement admissible against one codefendant that inculpates a codefendant "must be redacted to eliminate all incriminating references to the co-defendant." *Carpenter v. United States*, 430 A.2d 496, 502 (D.C.1981). *See Geter v. United States*, 929 A.2d 428, 431 (D.C.2007) (noting that limiting instruction "is almost never an acceptable alternative to redaction or severance)." Moreover, given the motivation to deflect blame, that a codefendant's statement falls within the hearsay exception for statements against the declarant's penal interest is insufficient, alone, to admit the statement against another codefendant. *See Lilly v. Virginia*, 527 U.S. 116, 128, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) ("[W]e have consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person.").

 Here, the hearsay statement was initially redacted, and neither Robles–Benevides nor Villatoro was named or otherwise directly implicated in Bonilla's statement.[39] Any potential prejudice from the unredacted version of Bonilla's ambiguous reference to "they" was largely cured by Bonilla's testimony clarifying that the "they" who had the knives when they got in the car were Velázquez and Ventura. Moreover, the trial court gave an instruction to the jury that it could use Bonilla's prior inconsistent statements only to evaluate his credibility and could not "consider it in any way in determining the guilt or innocence of another defendant." Consequently, the admission of Bonilla's out-of-court statements in a joint trial was not improper.

## IV. Severance

Appellants Bonilla and Pérez argue that their trials should have been severed because incriminatory hearsay statements made by each other were improperly admitted in a joint trial. Appellant Pérez also argues that he should have been tried separately because the evidence against him was *de minimis* when compared to the government's evidence against his co-defendants. We conclude that the trial court's admission of the statements and

---

38. Robles–Benevides also challenges on evidentiary grounds, but without elaboration, the admission of Bonilla's hearsay statement as well as Villatoro's statement to Benítez admitting his participation in the attack of the homeless man. We perceive no abuse of discretion in their admission as statements against penal interest. *See Laumer v. United States*, 409 A.2d 190, 199–200 (D.C.1979) (adopting the federal rule, Fed.R.Evid. 804(b)(3), admitting declarations against penal interests).

39. As to Villatoro, there was no evidence that he was a passenger in Bonilla's car.

denial of the motions for severance were not an abuse of discretion.

## A. Robles–Benevides's Statement Implicating Bonilla

Bonilla claims that he was entitled to a separate trial because Benítez testified at trial to a conversation he had in jail with Robles–Benevides in which Robles–Benevides implicated Bonilla in the stabbing of Helm. In that conversation, Robles–Benevides told Benítez that he (Robles–Benevides) argued with Velásquez during the brief ride in the back seat of Bonilla's car over who would use the knife when they were chasing after Helm.[40] Following this testimony, the trial court instructed the jury at counsel's request that the out-of-court statement could be used as substantive evidence only against the declarant, Robles–Benevides. On appeal, Bonilla claims that the introduction of Robles–Benevides's admission to Benítez prejudiced him because by saying that the argument took place in Bonilla's car and, inferrably, within his hearing, the statement necessarily incriminated Bonilla as a co-conspirator, or, at least, as an aider and abettor in the assault and murder of Helm.[41]

 "The disposition of a motion for severance is within the sound discre-tion of the trial court, and its ruling either way will be reversed only on a showing of an abuse of discretion." *Scott v. United States*, 619 A.2d 917, 930 (D.C.1993).[42] In a joint trial, if the government seeks to admit against a defendant his own out-of-court statement that incriminates not only the declarant, but also a codefendant, the trial court must ordinarily either sever the trials or exclude the statement. *See Akins v. United States*, 679 A.2d 1017, 1031 (D.C. 1996) ("[I]n a conspiracy trial, the trial judge has a special obligation to guard against the potential misuse of evidence where defendants are joined[,]" and "must monitor the prejudice that develops when otherwise inadmissible evidence is introduced by a codefendant or the government and [must] sever the trials where appropriate"); *cf. McCoy v. United States*, 890 A.2d 204, 215 (D.C.2006) (noting two crucial measures undertaken by trial judge that compensated for any possible prejudice that might have resulted from codefendant's confession: (1) the confession was redacted to eliminate any reference to defendant; and (2) the judge instructed the jury several times that codefendant's confession could be used only against codefendant). Neither severance nor exclusion is required, however, if the evidence would be admissible against the defendant in a separate trial. *See Coleman v. United*

---

**40.** According to Benítez, Robles–Benevides told him that "he had a blade with him. That when he was in [Bonilla's] car, that [he] and [Velásquez] were fighting over a knife.... [Velásquez] kept on asking him for a knife because he wanted to stab the deceased...."

**41.** Villatoro incorporates by reference the arguments in Bonilla's brief. As there was no evidence that Villatoro was in Bonilla's car when Robles–Benevides made the statement, there is no possible incriminatory inference as to him.

**42.** The government argues that Bonilla did not preserve this issue and we should review

for plain error because he did not specifically *identify admission of Robles–Benevides's* hearsay statement as grounds for severance. However, Bonilla had filed a pre-trial motion to sever based on the possibility that incriminating out-of-court statements by the codefendants might be admitted, and at trial Bonilla objected that Robles–Benevides's hearsay statement would incriminate him. We will review appellant's claim for abuse of discretion because his objection to the statement and the severance he had requested were "sufficient to apprise the trial court, as required, of the issues on which it was being asked to rule." *Ebron v. United States*, 838 A.2d 1140, 1147 (D.C.2003).

*States,* 948 A.2d 534, 545 (D.C.2008) (citing *Davis v. Washington,* 547 U.S. 813, 823–24, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

 Robles–Benevides's statement to Benítez, could have been introduced in a separate trial of Bonilla as a statement against Robles–Benevides's penal interest.[43] The statement directly implicated Robles–Benevides and the circumstances surrounding the statement had indicia of reliability. *See Laumer,* 409 A.2d at 199–200. Robles–Benevides voluntarily made the statement to his erstwhile friend and co-accomplice Benítez a few days after the assaults (before Benítez pleaded guilty and agreed to testify against appellants), while they were both in jail together. *See United States v. Taylor,* 328 F.Supp.2d 915, 926 (D.Ind.2004) (noting that hearsay statement "was made voluntarily by [codefendant] to [the pleading accomplice], in a private setting, and with no effort by [codefendant] to mitigate his own conduct"). Moreover, Robles–Benevides certainly had personal knowledge of his tussle with Velásquez in the car and it is unlikely that his recollection was faulty given that he made the statement shortly after the events. Although it could be argued that Robles–Benevides's statement that he and Velásquez had argued over the murder weapon sought to shift blame for the stabbing to Velásquez, there is nothing in Robles–Benevides's statement that incriminates Bonilla directly or implies that Bonilla overheard their argument; that fact would have to be inferred from the physical circumstances in which the statement was made, with Bonilla in the driver's seat and the passengers in the back seat of the car. But even that indirect inference was ruled out of bounds by the trial court's instruc-

tion that the statement could be used only against Robles–Benevides, as the person who made it. Most importantly, however, any incriminatory inference was cumulative to the more directly incriminating statement made by Bonilla himself, discussed *supra,* to the police that two of his passengers had brought knives to his car. Since Robles–Benevides's statement would have been admissible against Bonilla had he been tried separately, and did not prejudice him in this joint trial, the court did not abuse its discretion by denying the motion to sever Bonilla's trial.

### B. *Villatoro's Out-of-Court Statement Imputed to Robles–Benevides*

Robles–Benevides objects to Benítez's testimony at trial about an out-of-court statement made by Villatoro: "[Villatoro] said to me that he was going to get out on bail. I told him not to lie, that he had been involved with the thing with the street guy and that he had thrown rocks and bottles and he just laughed." Citing *Akins,* defense counsel objected at trial to the admission of this statement against Robles–Benevides as a coconspirator, presumably because the statement was made in jail and was not in furtherance of the conspiracy. *See Akins,* 679 A.2d at 1028 (in a joint conspiracy trial where the government relies on a theory of vicarious liability, statements may be introduced under the coconspirator exception to the rule against hearsay only if they were made in furtherance of the conspiracy). The trial court overruled the objection, noting that it had specifically instructed the jury that the statement could be used only against Villatoro. As the trial court pointed out, although the government had charged the

---

**43.** Because the statement was made not to the police, but to a perceived ally who was not then a government informant or witness, it was not testimonial and there was no right to cross-examination under the Confrontation Clause. *See Coleman,* 948 A.2d at 545 (citing *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354).

codefendants with conspiracy to assault or murder, it was "not asking for the instruction that everything be attributed to coconspirators." *Cf. Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (an overt act of one coconspirator is attributable to all coconspirators). The trial court, therefore, considered the rule in *Akins* to be inapposite.

■■■ There is no error in the trial court's ruling. As the government did not seek to attribute Villatoro's actions and statements to the other codefendants on a theory of vicarious liability (as agents), the trial court correctly overruled the objection defense counsel raised based on *Akins*. Moreover, Robles–Benevides does not identify how Villatoro's out-of-court statement incriminated him; Benítez never testified that Villatoro said anything implicating Robles–Benevides. As a result, there was no prejudice requiring severance of Robles–Benevides's trial. Inexplicably, Villatoro incorporates Robles–Benevides's argument on this point, but the hearsay statement was admissible against Villatoro as an admission. *See Powell v. United States*, 414 A.2d 530, 533 (D.C. 1980) ("[A]n admission by a party . . . may be entered into evidence despite the fact that the party does not testify.").

### C. *Pérez's Argument for Severance: De Minimis Evidence and Misjoinder*

■■■ Pérez raises a different argument for severance, that the government's case against him was much weaker than the case against the other codefendants. "Manifest prejudice [requiring severance] occurs only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants." *Bush v. United States*, 516 A.2d 186, 192 (D.C.1986) (internal quotations omitted). We disagree, however, that the evidence against Pérez was *de minimis*: three of the four eyewitnesses—José Pérez, Benítez, and Hugo Alemán—testified that they saw Pérez attack both the homeless man and Helm. On this record, the trial court did not abuse its discretion in denying the motion for severance.[44]

■■■ We also reject Pérez's claim of misjoinder. "Under Rule 8(b), defendants may be joined only if the charges against them 'are based on the same act or transaction or series of acts or transactions[,]' " *i.e.*, " 'where one offense logically leads to another.' " *Taylor v. United States*, 603 A.2d 451, 455 (D.C.1992) (quoting Super. Ct.Crim. R. 8(b); *Settles v. United States*, 522 A.2d 348, 352 (D.C.1987)). Though Pérez was not charged as an aider and abettor for Robles–Benevides's kicking Hallner or Salamanca's threats to Rosa García, those offenses were logically connected to the assaults on the homeless man and Helm, with which Pérez was charged. We nonetheless guard against undue prejudice to a defendant in a joint trial if "evidence of crimes neither charged against him nor related to him [is] introduced at his trial under circumstances that inevitably would lead the jury to consider him in fact a participant." *Davis v. United States*, 367 A.2d 1254, 1263 (D.C.1976).

44. For the same reason, Pérez's claim that the trial court erred in denying his motion for judgment of acquittal is also without merit. Pérez argues that the government's evidence against him was insufficient because the eyewitnesses were incredible. In reviewing an insufficiency claim, this court reviews the evidence *de novo* in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987). Because the evidence, if the jury credited the eyewitnesses, was sufficient for conviction, Pérez was not entitled to acquittal.

The charges against Robles–Benevides and Salamanca and the evidence related to Hallner and Rosa García, however, were so distinct that, on this record, we cannot say that they "inevitably would lead the jury" to convict Pérez of the crimes with which he was charged, assaulting the homeless man and killing Helm. Pérez's argument that the jury would have been unfairly prejudiced against him as a result of the joinder, rests on his unsupported characterization of his role in the assaults as tangential to the other codefendants. The eyewitnesses, however, described him as an integral participant in the assaults on the homeless man and on Helm, which were the central focus of the prosecution. The trial court did not abuse its discretion, therefore, in permitting Pérez to be tried jointly with the other defendants.

## V. Improper Prosecutorial Comments

Appellants Robles–Benevides, Pérez, and Villatoro argue that they were prejudiced by the prosecutor's improper comments at trial. Specifically, they claim that the prosecutor: (1) made an impermissible reference to their exercise of the Fifth Amendment right not to testify; (2) used inflammatory rhetoric during opening and closing argument; and (3) implied that they were guilty by association through repeated references to appellants as "gang members." No appellant objected either during the government's opening or closing argument. Therefore, with the exception of the reference to appellants' silence, which the trial court brought up *sua sponte*, this court's review is only for plain error. *See United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Irick v. United States*,

565 A.2d 26, 32 (D.C.1989) ("Where the defendant failed to object ... we will reverse his conviction only if the misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial.").

### A. *Remarks Implicating Appellants' Right Not to Testify*

 In opening statement, the prosecutor described for the jury the testimony they would hear from José Benítez:

And he will tell you he participated in the assault of Warren Helm. But José Benítez, unlike all of these other men, has taken responsibility for his crime. He's pled guilty. And whatever you want to call him, a plea agreement witness or a snitch, whatever you want to call him, Mr. Benítez will be called to the stand.

After recessing for lunch, the trial judge commented that the prosecutor's comments had come "dangerously close to a comment on the right of the defendants to put on no evidence and to not testify," and offered to give an additional corrective instruction to the jury if defense counsel wished. Defense counsel declined the court's offer and instead moved for a mistrial. The court denied the motions for mistrial, concluding that the prosecutor had made a "passing remark" that would not "deprive anybody of a fair trial." The court repeated its offer of a curative instruction, which defense counsel again declined.[45]

 The government concedes that the prosecutor's remark was improper, and we agree. The question that remains

---

45. Contrary to Pérez's assertion, the court did not abuse its discretion by not addressing the jury *sua sponte* about the prosecutor's remarks since his defense counsel declined the court's repeated offer to do so. *See (Darryl)*

*Smith v. United States*, 665 A.2d 962, 967 (D.C.1995) ("[A] trial court does not abuse its discretion when prejudice can be cured by an instruction to the jury, and a corrective instruction is offered but declined.").

is whether it was unduly prejudicial. "The applicable test to determine whether [improper prosecutorial comments] caused substantial prejudice is whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Diaz v. United States,* 716 A.2d 173, 181 (D.C.1998) (quoting *Dyson v. United States,* 418 A.2d 127, 132 (D.C. 1980)). "Viewing the comments in context, we must consider the gravity of the misconduct, their direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case." *Id.* (quoting *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985)).

■■■■ In evaluating a claim that the prosecutor improperly commented on a defendant's exercise of the right not to testify, "reversal is warranted only if the challenged remarks were manifestly intended as comments on his failure to testify, or if they were of such a nature that the jury 'naturally and necessarily' would take them as such." *Bowman v. United States,* 652 A.2d 64, 72 (D.C.1994) (quoting *Byrd v. United States,* 364 A.2d 1215, 1218 (D.C. 1976)). Here, the prosecutor's comments seem to have been intended primarily to encourage the jury to trust Benítez's testimony even though he had himself participated in the assaults. In making this assessment, we are conscious that opening and closing arguments

> are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most dam-

aging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "Moreover, the fact that a challenged comment was made 'not during the trial . . . but in an opening statement,' and was not repeated later, may itself tend to mitigate any prejudice." *Munn v. United States,* 703 A.2d 1239, 1241 (D.C.1997) (quoting *Owens v. United States,* 497 A.2d 1086, 1092 (D.C.1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986)).

■■■ Here, the trial court did not consider the prosecutor's improper remark to be grave because, although it came "dangerously close" to disparaging appellants' exercise of their right not to testify, the prosecutor did not directly do so. "[I]n deciding whether there was substantial prejudice, the assessment of the trial judge 'is entitled to some reliance since only he [or she] had the opportunity to appraise the effect of the remarks in their setting.'" *Munn,* 703 A.2d at 1241–42 (quoting *Jenkins v. United States,* 374 A.2d 581, 585 (D.C.1977), *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977)). Moreover, none of the appellants objected or brought the issue to the trial court's attention. "Although a failure to object promptly is not dispositive of the issue of prejudice . . . it constitutes some evidence that appellants did not immediately perceive the challenged argument as prejudicial." *Parks v. United States,* 451 A.2d 591, 613 (D.C.1982) (internal citations omitted).

We recognize, however, that the prosecutor's opening remarks had a direct relation to appellants' guilt, because the prosecutor was arguing that the jury should credit Benítez in order to find appellants

guilty. But the trial court gave two standard instructions at the beginning and end of trial reminding jurors that appellants had "an absolute right not to testify" and that the law did not require the defendants to prove their innocence or produce any evidence. Moreover, the government's case against appellants, as we have discussed, presented compelling evidence of their guilt. On this record, we can conclude that given the limited extent of the prosecutor's comment, there was no substantial prejudice to appellants. *See Munn,* 703 A.2d at 1242–43 (no substantial prejudice where prosecutor made isolated improper remarks during opening statement because the trial court acted promptly to rein in the prosecutor and the government's case was otherwise strong).[46]

B. *Inflammatory Rhetoric During Opening Statement and Closing Argument*

■ Appellants also complain that four comments the prosecutor made were inflammatory. In his opening statement the prosecutor described Helm as a "bloody corpse" with his "guts spilling out," who died a "premature and tragic" death; and said that one of the kicks Robles–Benevides inflicted on Helm was so "hard that Barry Hallner could not believe anyone could have survived that kick." At the end of trial, during rebuttal argument, the prosecutor characterized the government witnesses' testimony as "screaming" that appellants were guilty, and accused appellants of intimidating witnesses.[47]

■ The prosecutor's description of Helm's injuries were graphic, but were amply supported by the evidence. Hallner, who was a medical assistant, testified about the force of the kick he saw inflicted on Helm's chest: "[I]f you could kick something to crush it, that's what it was like"; and "[Helm was] kicked so hard in the chest you could just feel it." Hallner also described the extensive stab wounds on Helm's body: "I pulled up his shirt and that's when I noticed he had quite a number of stab wounds and an eviscerated abdomen[,] his intestines were hanging out of his stomach." In urging the jury to return a guilty verdict, we have said, the prosecutor may—within bounds—describe "the gritty reality of the crime, including its human toll." *Chatmon v. United States,* 801 A.2d 92, 100 (D.C.2002). Here, the prosecutor's one-time reference to the grievous injuries inflicted on Helm did not exceed these bounds in the context of a trial in which the jury heard of repeated unprovoked brutal assaults by a mob against two different individuals. *Cf. id.* at 101 (commenting on impropriety of prosecutor's thrusting into the "face of each of the jurors" of blown-up "gory" pictures of the decedent "lying in a huge pool of blood on the floor" while asking jurors to return a verdict they could "live with"). The prosecutor's comment regarding witness intimidation also was supported by García's testimony that Salamanca threatened her if she testified and a threatening letter sent by Robles–Benevides to Benítez.[48]

---

**46.** In the case of Pérez, who did take the stand, any perceived sting from the prosecutor's remark would not have applied to him. Pérez does not contend that he felt compelled to testify by the prosecutor's comment.

**47.** The prosecutor said: "On the streets of our city, these men were able to attack, and they were able to assault, and they were able to silence. The beautiful thing about this courtroom, the beautiful—the magnificence of

our judicial system, of each and ever[y] participant in this judicial system, is that, within these four walls, no one can intimidate or attack or silence."

**48.** Although it was not a charged as an offense, a letter written by Robles–Benevides threatening Benítez not to testify was admitted into evidence without objection. We note, however, that the prosecutor's use of the plural "these men"—referring to appellants with-

▪ The prosecutor is not prohibited from expressing reasonable indignation, and his description of the testimony as "screaming" for conviction was a forceful, if unusual, means to communicate to the jury that the government's evidence was strong, *see Irick,* 565 A.2d at 36–37 ("The prosecutor may ... prosecute 'with earnestness and vigor.'" (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935))), and did not improperly vouch for the credibility of the government's witnesses. *Cf. Coleman,* 948 A.2d at 549 (where defendant took the stand and testified that he was innocent, it was improper for the prosecutor to argue in rebuttal that it would make "no sense" if the police and prosecutor "spen[t] four years of their lives investigating the wrong person"). For the foregoing reasons, the court did not plainly err by not admonishing the prosecutor *sua sponte* regarding these comments or declaring a mistrial.

## C. *References to Gang Membership*

Pérez argues that the prosecutor exceeded the court's ruling that limited references to gang membership. At the beginning of trial, Villatoro's counsel asked that the prosecutor be prevented from making any reference to the gang "Mara R,"[49] because such references would be more prejudicial than probative. The court declined to impose a blanket restriction, explaining that appellants' gang membership was probative of the government's charge of conspiracy. The court did, how- ever, limit the prosecutor's use of gang membership only to show identity and membership in the conspiracy. Appellants do not challenge the court's ruling. Pérez argues instead that the trial court abused its discretion by allowing the prosecutor to refer excessively to appellants as "gang members."

▪ We disagree that the prosecutor's gang references were excessive. In opening statement, the prosecutor used the term "gang" only once in describing witness Benítez: "[n]ow you might not like Mr. Benítez. He is a member of Mara R, which incidentally is spelled, M–A–R–A and the letter 'R.' He is a gang member. He's a fellow gang member." The prosecutor also described how Villatoro "flashed a sign" at another "group," resulting in a fight, but made no other explicit reference to gangs at the outset of trial. Pérez complains of only two other instances during the course of the six-day trial when the term was mentioned. First, during direct examination of Investigator Roberto Torres, the prosecutor asked him to describe his official duties. Torres replied that he was "assigned to Metropolitan Police Department's Criminal Investigation Division Intelligence, the unit on gangs .... [and was] responsible to follow, concentrate on the Hispanic gang activities in Washington, D.C." Second, the prosecutor asked Torres about the informal nature of membership in East coast gangs as compared to those on the West coast.[50] The trial

out further specification—see *supra,* note 47, arguably was overinclusive.

49. "Mara" means "gang" in Caliche, which is a collection of slang words originated in El Salvador. JAMES DIEGO VIGIL, A RAINBOW OF GANGS, 142 (University of Texas Press 2002). The word "mara" was not defined for the jury.

50. The prosecutor's questioning was apparently in response to defense cross-examina- tion of Benítez, where the defense sought to disprove any association among appellants based on membership in Mara R by having Benítez testify that there was no formal structure or initiation process in Mara R. Arguably, defense counsel had opened the door to this line of questioning by its prior cross- examination of Benítez, and cannot complain of the prosecutor's attempt to rehabilitate Benítez by having Investigator Torres testify

court stopped this line of questioning, upon objection, and instructed the jury to disregard it. During a bench conference, the trial court reaffirmed that any other questions that pertained to the association of appellants with each other would be permissible, but that general questions about gang organization would not. The government then ended its direct examination of Investigator Torres without further questions about gangs or appellant's gang membership. During closing argument, the prosecutor, heeding the trial court's injunction, characterized the case as being "about mob violence"—and did not make reference to a "gang." Appellants complain of no other use of the term "gang" during the course of the trial.

Here, the trial court was well aware of the potential prejudice from unsupported or unnecessary references to gang membership, and placed appropriate and clear restrictions on such evidence. *See Mercer v. United States,* 724 A.2d 1176, 1184 (D.C. 1999) ("Our case law instructs the trial court to be cautious in the admission of potentially inflammatory evidence."). Given that appellants' association with each other in Mara R appears to have been an integral factor in their near-instant con-

spiracy to assault the homeless man and Helm after they were ousted from the nightclub, the prosecutor's restrained use of gang references did not exceed the trial court's ruling or constitute prosecutorial misconduct.

Therefore, we are not persuaded by appellants' arguments that the prosecutor made improper comments that warrant reversal.

## VI. Juror Misconduct and Bias

■ Appellants argue that the trial court abused its discretion by not granting a mistrial once defense counsel reported that two of the jurors had discussed the case outside of the jury room. On the second day of trial, Salamanca's investigator overheard two of the jurors discussing the case in the restroom during the luncheon recess. According to the investigator, one juror said, "Spanish people love stabbing each other," and the other juror agreed. Out of the presence of the jury, the court conducted a *voir dire* of the two jurors the investigator identified as the ones she overheard.[51] The jurors denied talking about "stabbing" or "groups of people" in general,[52] and affirmed that they

---

as to the informal nature of membership in East coast gangs.

**51.** The investigator described that one of the jurors was a woman who wore a yellow jacket, had short hair, and was "sitting on the far right." The other juror was wearing a gray suit and had short hair. The clerk called the first juror, who was wearing an orange jacket (no juror wore yellow), who confirmed that she ate lunch in the courthouse cafeteria with a fellow juror and went to the bathroom afterwards. She told the court that the "lady sitting right over there" went to lunch with her. After the court finished conducting *voir dire* on the first juror, the court asked the clerk to call the second juror, and if there was more than one wearing a gray suit, to pull the first juror outside and have her point out the person with whom she had lunch. The inves-

tigator recognized both jurors on the stand during *voir dire* as the ones she had overheard in the restroom.

**52.** The court questioned the first juror:

The Court: Do you recall having any conversation in the ladies room?

The Juror: No, huh-uh.

The Court: All right.

The Juror: About what you say? About this case?

The Court: Well, not necessarily about this case in particular but about—about stabbing or about—

The Juror: Oh, no, nothing. Because like I said, me and one of the jurors was at lunch together and we didn't—

The Court: Okay. You didn't have any conversation about groups of people in general?

The Juror: No, it wasn't nothing like that.

could be fair and impartial. The court concluded that the jurors could remain on the jury because: (1) they were adamant they could be fair; (2) there was no evidence that they had discussed the case with any of the other jurors; and (3) at most, they demonstrated some stereotypical thinking, a phenomenon almost unavoidable in any jury, but which they would not necessarily apply in this case. The trial court denied the defense motion for a mistrial, but did grant the motion to make the jurors alternates; and the jurors did not, in fact, participate in deliberations.

We see no reason to reverse on this basis. The trial court conducted a full *voir dire* to examine the jurors' potential bias, during which defense counsel were able to question the jurors. *See Parker v. United States,* 757 A.2d 1280, 1287 (D.C. 2000) ("When there is a claim of juror partiality, 'the remedy . . . is a hearing in which the defendant has the opportunity to prove actual bias.'" (quoting *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982))); *Shannon & Luchs Mgmt. Co. v. Roberts,* 447 A.2d 37, 41 (D.C.1982). "Following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, . . . and the findings of fact underlying that determination are entitled to great deference." *Medrano-Quiroz v. United States,* 705 A.2d 642, 649 (D.C.1997) (quoting *Washington v.*

*Washington Hosp. Ctr.,* 579 A.2d 177, 185 (D.C.1990)). Here, the trial court did not simply accept the jurors' denials and assertions of fairness, *see Wilburn v. United States,* 340 A.2d 810, 812 (D.C.1975) (finding the trial court abused its discretion by not excusing a juror who was "more than mere acquaintances" with a witness's mother based on the juror's self-evaluation that she could be impartial), but after hearing from the jurors, allowed that they had "stereotypical" thinking about "Spanish people" (*i.e.,* Hispanics) but determined that they could be fair.

Moreover, appellants have shown no prejudice because the jurors in question did not engage in the deliberations. The only possible argument for mistrial would be that since both jurors were asked generally whether they had talked or heard about "stabbing" or "groups of people," there was no guarantee of an effective *voir dire* unless the court confronted them point-blank about the comment one of them supposedly made, "Spanish people love stabbing each other." [53] But this approach—which defense counsel agreed would do more harm—would be fraught with its own risk of injecting bias. Even though it would indeed be troubling if the two jurors harbored some stereotypical thinking about Hispanics generally in a case where the defendants were Hispanic, there was no evidence that they had communicated these thoughts to their fellow

---

The court similarly questioned the second juror:

The Court: . . . Ma'am, during the luncheon recess, did you hear or participate in any conversation concerning stabbings or groups of people?

The Juror: Did I hear what now?

The Court: Any conversation concerning stabbings or groups of people?

The Juror: Oh, no. No.

The Court: Okay. Have you discussed or heard other jurors in this case discussing any situations at all related to the kind of case that's on trial?

The Juror: No. No. No.

**53.** Because the trial court had phrased the questions vaguely to avoid repeating the comment, the court noted that "it is also possible that my question in asking about groups and about stabbings that they weren't lying so much as not understanding what I was getting at."

jurors who delivered the verdict. On this record, we cannot say that the trial court clearly abused its discretion in finding no manifest prejudice to warrant a mistrial.[54]

## VII. Ineffective Assistance of Counsel: § 23–110 Motions of Villatoro and Salamanca (Appeals Nos. 01–CO–1019 & 02–CO–1253)

Both Villatoro and Salamanca filed motions pursuant to D.C.Code § 23–110 (2001) claiming ineffective assistance of counsel based on their alleged failure to call certain witnesses. The trial court denied both motions without a hearing.

The standard for evaluating claimed deprivations of the Sixth Amendment right to counsel is well-established:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[T]he decision to call witnesses is a judgment 'left almost exclusively to counsel.'" *Smith v. United States,* 454 A.2d 822, 825 (D.C.1983) (quoting *Terrell v. United States,* 294 A.2d 860, 864 (D.C.1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1398, 35 L.Ed.2d 603 (1973)). "Our standard of review is a deferential one: 'the finding of ineffective assistance of counsel is a mixed question of law and fact ... and upon review, we will not reverse the trial court's findings of fact if they are supported by evidence in the record.'" *Bowman,* 652 A.2d at 73 (quoting *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985)). To meet the second prong—prejudice—the claimant must show that, but for counsel's deficient performance, there is a "reasonable probability" that the outcome of the trial would have been different. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052.

### A. *Villatoro*

Appellant Villatoro claimed in the trial court that his counsel's performance was deficient because he did not request a severance of his trial in order to permit his codefendant (Robles–Benevides) to testify on his behalf, failed to call exculpatory witnesses, and in cross-examining José Pérez, elicited an identification of Villatoro as one of Helm's attackers.

---

54. Pérez also argues that the jury's note to the judge during the second day of trial, saying that "the jurors are confused because full names and nicknames of defendants are not being used together," demonstrated that some jurors had engaged in impermissible discussion of the case. The court told the jury that it "appreciated[d] the frustration," but to "understand that each witness can only testify in a way that that witness knows an individual." The court instructed the jury to "bear with us and keep track as best you can and continue as I'm sure you have been doing to be diligent in paying attention to the evidence that individually comes in against individuals and not lump anybody together." We have held that a trial court may, and indeed must, consider notes from a jury expressing confusion, and that the proper remedy is instruction from the trial court, not to declare a mistrial. *See Alcindore v. United States,* 818 A.2d 152, 155 (D.C.2003).

■ In response to Villatoro's claim that counsel should have requested severance so that Robles–Benevides could testify on his behalf, the government provided an affidavit of defense counsel, Manuel Retureta. In his affidavit, counsel stated that neither Robles–Benevides nor his counsel ever approached him before or during trial with an offer to testify on Villatoro's behalf, nor had Villatoro told counsel that Robles–Benevides would exculpate him. The first indication defense counsel had that Robles–Benevides would have been willing to testify on Villatoro's behalf was when he received a copy of Villatoro's § 23–110 motion with a letter attached that had been written by Robles–Benevides, dated approximately one month *after* the jury returned their guilty verdicts, in which Robles–Benevides stated that he "did not see [Villatoro] on the scene or nearby." Villatoro did not proffer any affidavit—his own or one from Robles–Benevides or his lawyer—that this information had been conveyed to Villatoro's counsel at an earlier time.

■ The trial court concluded that because Villatoro had failed to rebut defense counsel's affidavit specifically denying that he had been so notified, there was no need to hold a hearing. We agree that

without a factual dispute, the trial court did not abuse its discretion in rejecting this basis for Villatoro's ineffectiveness claim without a hearing.[55] *See Ready v. United States*, 620 A.2d 233, 235 (D.C. 1993) (holding there was no error where trial court denied a § 23–110 claim without a hearing in the "absence of an affidavit or other credible proffer as to the allegedly exculpatory nature of [the] testimony"); *Ginyard v. United States*, 816 A.2d 21, 38 (D.C.2003) (upholding denial of § 23–110 motion without a hearing where appellant failed to proffer any evidence that his defense counsel knew or should have known prior to trial that a witness could provide exculpatory testimony).

■ Villatoro did offer affidavits (albeit unnotarized) from his brother, Wilmer ("Chupacabra") Villatoro, Wilmer's girlfriend, Erica García, and three other friends, Sandy Leonzo, Blanca Buruca, and José Guevara, all stating that they had offered to testify at trial on Villatoro's behalf, but that his trial counsel had not called them. In his affidavit, Villatoro's trial counsel gave detailed reasons why he decided not to call any of the witnesses after having interviewed each of them—some more than once. Counsel explained that Wilmer Villatoro ("Wilmer") and Eri-

55. In the alternative, Villatoro argues that Robles–Benevides's post-trial letter is newly-discovered evidence warranting a new trial. Villatoro filed a motion with the trial court for a new trial on this basis, which the trial court also denied without a hearing. (Appeal No. 02–CO–1231) In its order denying the motion, the trial court noted that Villatoro had asked for, and had been allowed, additional time to secure an affidavit from Robles–Benevides affirming, as stated in his letter, that he did not see Villatoro at the attack. Because no such affidavit was ever filed, however, the trial court concluded that Villatoro's claim was "too vague and conclusory to warrant serious consideration or a hearing." Furthermore, the court observed that, were it to grant a new trial, there would not only

remain strong incriminating testimony from others, but the government would then be able to introduce appellant's own confession admitting to taking part in the attack, which had been suppressed at the joint trial to avoid *Bruton* prejudice to his codefendants. As a result, the trial court found, even with Robles–Benevides's exculpatory testimony, a new trial would be "unlikely to result in an acquittal." For newly-discovered evidence to warrant a new trial, it must be "of such nature that in a new trial it would probably produce an acquittal." *Godfrey*, 454 A.2d at 299 (quoting Super. Ct.Crim. R. 33). We cannot say, on this record, that the trial court abused its discretion in denying Villatoro's motion for a new trial without a hearing.

ca García ("Erica") initially told him that Villatoro had, in fact, run up 14th Street, chasing after Helm. In subsequent interviews, however, trial counsel found that Wilmer's "accounts of what occurred … repeatedly changed, and were inconsistent, and that Erica appeared to be parroting these differing accounts as they arose." Ultimately, they settled on an account of events that closely matched the ones in their unnotarized affidavits: that they watched Villatoro walk about half a block north on 14th Street, then lost sight of him because they themselves walked off to a nearby gas station for a soda. Their proffered testimony, even if true, would hardly have been exculpating as they placed Villatoro at the scene even if they no longer inculpated him directly in the assault by saying that he chased Helm. This was important because, as Retureta explained in his affidavit, when he found out prior to trial that government witness José Pérez was not likely to testify that Villatoro had been at the scene of Helm's murder, he "did not want to elicit testimony from any witness, including Wilmer Villatoro or Ms. [Erica] García, that Mr. Villatoro traveled north on 14th Street toward the murder scene at or about the time the crime was occurring." In addition, Retureta had grave concerns about calling Wilmer as a witness because "his demeanor was unpredictable, his thought process was inconsistent, and his affect was slow." Counsel also concluded that Erica would not be a very credible witness given that she had merely "parroted" Wilmer's inconsistent accounts. Retureta states in his affidavit that he discussed extensively with appellant whether or not to call Wilmer and Erica, and that at all times Villatoro was in agreement that it would not be in his best interest to call them as witnesses.

The other potential witnesses Villatoro identifies (Sandy Leonzo, Blanca Buruca, and José Guevara) also provided unnotar-ized affidavits in which they stated that they had told counsel prior to trial that Rosa García had been with them in a taxi riding home during the entire time the attacks were taking place, and that none of them—including García—saw any part of them. Retureta does not dispute that he heard those stories, adding that all of the defense counsel had interviewed Leonzo and Buruca (but not Guevara), as well as Mayra Rivera prior to trial. During that interview, Leonzo and Buruca disclosed that they had given the police inconsistent statements about their knowledge of the attacks and had even identified from police photographs some of the defendants as perpetrators, including Villatoro. In his affidavit, counsel Retureta stated that he had been concerned "the jury might give greater credence to Rosa García's [inculpatory] testimony," if these witnesses were to testify, because he expected that the government would aggressively impeach them with their prior inconsistent statements and identifications—as proved true at trial when the prosecutor cross-examined Mayra Rivera after Bonilla's counsel called her to the stand. Counsel stated (and Villatoro did not contest) that he discussed the matter with Villatoro, who agreed that these witnesses should not be called to testify. Based on the reasons given in counsel's affidavit, the trial court found that Villatoro's trial counsel was not deficient in not calling these witnesses.

Villatoro argues that the trial court should not have rejected this claim without a hearing. The trial court found, however, that Villatoro had not proffered any evidence that contradicted or rebutted his defense counsel's affidavit. This is, therefore, not a case "where the credibility of counsel versus the credibility of the defendant is at issue, [and] the court can resolve the conflict only by conducting an evidentiary hearing." *Reaves v. United States*,

694 A.2d 52, 58 (D.C.1997). Rather, because this is a case "[w]here the existing record provides an adequate basis for disposing of the motion, the trial court may rule on the motion without holding an evidentiary hearing." *Ready*, 620 A.2d at 234. Further, the affidavits from the potential witnesses fail to create a material *factual* dispute requiring an evidentiary hearing. *Ginyard*, 816 A.2d at 38. As in *Ginyard*, there was "no dispute that [defense counsel] had interviewed [the allegedly exculpating] witnesses before trial and knew generally what they had to say," nor was there any dispute "about the testimony [they] could have given at trial." *Id.* Most importantly, there was no dispute about counsel's reasons for not calling them: nowhere in his proffered affidavits does Villatoro challenge his counsel's assessment of the credibility of the potential witnesses or the minimal exculpatory value of their proffered testimony. Tellingly, Villatoro does not dispute his trial counsel's assertion that he discussed with Villatoro the decision not to call these witnesses, and that Villatoro agreed they should not be called. Since counsel's reasons for not calling the witnesses were uncontradicted, there was no material factual dispute before the court that required a hearing. Villatoro "did not challenge the truth of [defense counsel's] reasons, but rather their soundness. Since that challenge presented a question of law rather than of fact, the trial court did not abuse its discretion in deciding the issue without holding an evidentiary hearing." *Id.; cf. Lopez v. United States*, 801 A.2d 39, 45–46 (D.C.2002) (holding that where there is a factual dispute between appellant and his trial counsel that can only be resolved by weighing their credibility, the trial court must hold an evidentiary hearing).

■ On the adequacy of counsel's performance, we note first that this is not a case in which defense counsel failed to interview potential witnesses or to explore whether their testimony could be exculpatory, *cf. Cosio v. United States*, 927 A.2d 1106, 1127 (D.C.2007) (en banc); *Frederick v. United States*, 741 A.2d 427, 439 (D.C. 1999) (holding counsel deficient for failing to interview exculpating witnesses), nor a case in which defense counsel failed to articulate any fact-based reason for not calling the witnesses.[56] *Cf. Gillis v. United States*, 586 A.2d 726, 728–29 (D.C.1991) (holding defense counsel's statement that he had "reasons" for not calling witnesses, without further explanation, was an insufficient basis for finding the decision to be reasonable trial strategy). The trial court, therefore, did not abuse its discretion in denying appellant's motion for a new trial for defense counsel's decision not to call these witnesses. As the trial court correctly noted, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Where defense counsel proffers facts showing that he thoroughly investigated the allegedly exculpatory witnesses prior to trial, and proffers specific facts that support a plausible strategic decision not to call them, the burden is on appellant to proffer specific facts and reasons challenging the reasonableness of that decision. *See Ginyard*, 816 A.2d at 38. Since Rivera was expected to testify to the same facts to which Leon-

---

**56.** Retureta candidly conceded in his affidavit that he could not remember why he did not call Guevara to testify. But because Mayra Rivera testified that Guevara was "very drunk" at the time of the attacks, counsel stated in his affidavit that he would not have called Guevara to corroborate her testimony. Whatever slight probative value would have remained if Guevara had testified after being impeached with his drunkenness at the time, would have added nothing new, only corroboration of Mayra Rivera's testimony.

zo, Buruca and Guevara would have testi- fied[57]—that Rosa García left with them and saw nothing of the attacks—it was reasonable for Villatoro's trial counsel to conclude that the cumulative testimony of those additional three witnesses would not be worth the risk he anticipated: impeach- ment with the witnesses' own prior incon- sistent statements to the police inculpating Villatoro that would have made govern- ment witness Rosa García (who never changed her story) appear more credible. Moreover, it was also reasonable for coun- sel to consider that Wilmer Villatoro and Erica García's testimony, at least, posed the risk of inculpating his client since they said that they last saw Villatoro walking up 14th Street in the direction of the at- tack on Helm.

More significant is Villatoro's third ground for claiming that his trial counsel was constitutionally deficient be- cause during cross-examination, counsel elicited from government witness José Pérez that Villatoro hit Helm—something the government had not accomplished in its direct examination and which counsel should have been aware was a risk. Prior to direct examination, the government had given defense counsel a copy of José Pér- ez's grand jury testimony. Although Villa- toro concedes that the grand jury testimo- ny could be read to imply that Villatoro took part in the attack, he emphasizes that José Pérez never identified Villatoro by name before the grand jury as one of the attackers, while did specifically identify the other appellants. On direct examina- tion at trial, José Pérez again did not identify Villatoro by name as one of the men who assaulted Helm, even though the

government made a specific point of ask- ing Pérez to name and make an in-court identification of the other four codefen- dants. On cross-examination, Villatoro's counsel asked Pérez whether he saw Villa- toro stab anyone, to which he answered, "no." Apparently believing that José Pér- ez would not testify to having seen Villato- ro participate in the attack at all, defense counsel then went one step further and asked Pérez, "Did you see Oscar Villatoro hit anyone?" This time, he answered, "yes." Defense counsel immediately im- peached Pérez with his testimony before the grand jury where he did not identify Villatoro as one of Helm's attackers. The prosecutor then tried to rehabilitate Pérez by confirming that his trial testimony— that he saw Villatoro hit Helm—was true.[58]

In considering this complaint of deficient performance, the trial court rea- soned that, "[a]lthough counsel's affidavit does not address his thought process in cross-examining José Pérez, the Court finds (based on the record and argument of the government) that counsel cannot be faulted for risking the question on cross- examination that happened to ultimately hurt the defense." In reviewing claims of ineffective assistance, we do not second- guess counsel's judgments if they fall with- in the "wide range of reasonable conduct." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Pressing José Pérez as to whether he saw Villatoro hit Helm posed a risk, and it was a risk counsel understood well, as counsel did not want to call Wilmer Villatoro or Erica García based on his expectation that Pérez would not accuse Villatoro as one of

---

57. For this reason, there would have been no significant prejudice caused by failing to call witnesses whose testimony would have been cumulative.

58. On redirect examination, the prosecutor asked, "Now as you sit here today, Mr. Pérez, can you please tell the ladies and gentlemen of the jury what you remember [Villatoro] doing to the man who was stabbed." Pérez replied, "Hitting."

the attackers. But counsel's calculated risk had a basis in the record. The government had specifically asked José Pérez to identify other attackers by name before the grand jury, and Pérez had not then named Villatoro. At trial, the government asked José Pérez to identify the other four defendants, but did not seek to elicit an identification of Villatoro. In light of Pérez's silence regarding Villatoro's role in the attacks, and the government's seeming care to avoid any question specific to Villatoro's role, it was not unreasonable for defense counsel to suspect that José Pérez did not, in fact, see Villatoro attack Helm, and would confirm that if asked. We have no doubt that many—perhaps most—defense counsel would have left well enough alone, following the "cardinal rule of examination" to not ask a question if counsel does not know the answer, and exploited this "hole" in the government's case during closing argument. *Chatmon,* 801 A.2d at 109. But "[m]ere errors of judgment and tactic as disclosed by hindsight do not, by themselves, constitute ineffectiveness." *Lane v. United States,* 737 A.2d 541, 549 (D.C.1999) (holding defense counsel was not constitutionally ineffective in adducing evidence that arguably hurt the defendant more than it helped) (quoting *Curry,* 498 A.2d at 540). Therefore, although defense counsel's tactics unexpectedly led José Pérez to identify Villatoro as an attacker and was a set-back for the defense, that alone does not constitute deficient performance if counsel's actions were the result of a reasoned and reasonable strategy supported by the facts in the case. Here, counsel's questions appear to have been part of an effort to use the government's witness to exculpate his client, and had a factual basis. *Cf. Cosio,* 927 A.2d at 1136 (Ruiz, J., concurring) ("the reasonableness of [counsel's action] must be viewed in light of the facts known in the particular case ... counsel's actual reasoning re-

mains important"); *Chatmon,* 801 A.2d at 109 (noting that counsel had been warned that asking a question would open the door to prejudicial government evidence).

In addition, we agree with the trial court that, even if counsel's performance had been deficient, Villatoro has not shown a reasonable probability that the outcome of the trial would have been different absent José Pérez's testimony during cross-examination that Villatoro participated in assaulting Helm. Although Pérez's identification no doubt hurt the defense, counsel quickly impeached him with his testimony before the grand jury, where he did not identify Villatoro as one of the assailants. Even without the prosecutor's attempt to nail down Pérez's identification of Villatoro on redirect, the government's remaining evidence implicating Villatoro in the assault and murder was strong. In her report to the police, before the grand jury, and at trial, Rosa García consistently identified Villatoro as one of the men who attacked Helm. José Benítez identified Villatoro as the one who initiated the attack on the homeless man, and then threw rocks and bottles at the occupants of the car who came to aid him. Moreover, as the trial court noted, if it had granted Villatoro's motion for a new trial, his own videotaped confession (which had been excluded in the joint trial because of *Bruton* concerns) would then have been admissible. In that confession, Villatoro admitted to kicking Helm while he was on the ground after he had been stabbed. Finally, as discussed above, Villatoro offers no rebuttal to defense counsel's reasonable prediction that if he had called the additional witnesses who presented affidavits for the § 23–110 motion, they would have been thoroughly impeached by the government in cross-examination. On this record, the trial court did not err in denying,

without a hearing, Villatoro's motion claiming ineffective assistance of counsel.

## B. *Salamanca*

Salamanca likewise claims that his trial counsel was constitutionally ineffective because he also failed to call Sandy Leonzo, Erica García and Blanca Buruca to impeach Rosa García by testifying that she had been drinking and could not have identified any of the attackers because she had left before the assaults. Salamanca was not charged with participating in those attacks, but, he argues, by impeaching García's account that she saw the attackers, the witnesses would have undermined the credibility of Rosa García's testimony that Salamanca physically threatened her against talking to police about the attacks the following day.

■ The trial court denied Salamanca's claim of ineffective assistance without a hearing. The trial court noted that, in her affidavit filed in support of appellant's motion, Erica García did not state that she was with Rosa García on the night in question, or had any knowledge of her whereabouts (indeed, she does not mention Rosa García in her affidavit at all).[59] The trial court then properly concluded that Salamanca had not offered any evidence in support of his claim that Erica could have impeached Rosa García's testimony that she witnessed the attack on Helm.

With regard to the other witnesses, Salamanca's trial counsel, Bradford Barneys, stated in his affidavit that, along with the other defense counsel, he had interviewed Sandy Leonzo and found her incredible. He based that determination on her general demeanor and because she told defense counsel at the time that she left the scene

after the assaults had occurred, not before as later claimed in her affidavit. For these reasons, Salamanca's trial counsel decided that Leonzo would likely hurt appellant Salamanca more than help him. Though he stated that all of the defense counsel had jointly interviewed Leonzo and Buruca together with Mayra Rivera, Salamanca's trial counsel admitted in his affidavit that he had "no independent recollection of having talked with Blanca Buruca." According to trial counsel, he discussed with Salamanca his decision not to call Leonzo and Buruca, and Salamanca agreed. Salamanca did not provide any affidavit rebutting his trial counsel's assessment of these witnesses' credibility or the decision not to call them as defense witnesses.

■ As in Villatoro's case, Salamanca does not challenge the truth of his trial counsel's attested facts, but rather the soundness of his decision not to call Leonzo and Buruca. The trial court found that the decision of Salamanca's counsel not to call Leonzo was based on a reasoned assessment well within his discretion. *See Smith*, 454 A.2d at 825 (holding the decision whether to call a witness is "left almost exclusively to counsel"). It also found no prejudice, and we agree. Rivera's testimony was intended to discredit Rosa García, who was the sole witness to testify about Salamanca's threat and assault. But García was also impeached for bias because of her boyfriend's (Benítez) cooperation with the government and her own delay in reporting Salamanca's threats to the police. The jury, however, chose to believe her account, and we think it unlikely that it would have been swayed

---

59. Nor did Erica mention Rosa García in her affidavit in support of Villatoro's § 23–110 claim. As discussed above, she stated in that affidavit that she was with Wilmer Villatoro at a gas station to get a soda. She did not say that she left with Blanca Buruca and Sandy Leonzo.

otherwise by Buruca's and Leonzo's proffered testimony, which would have been cumulative of Mayra Rivera's trial testimony. The government's case against Salamanca for assault was based on Benítez's testimony that he saw Salamanca knock the homeless man to the ground, and neither Garcia, Leonzo nor Buruca had anything to say in this regard. We conclude that the trial court did not err in denying, without a hearing, Salamanca's motion for a new trial based on ineffectiveness of trial counsel.

## VIII. Erroneous Aiding and Abetting Instruction

 Finally, appellants Bonilla, Villatoro and Robles–Benevides[60] claim in post-argument submissions that their convictions for first-degree murder were tainted by the aiding and abetting instruction given in this case, an instruction that the *en banc* court subsequently disapproved in *Wilson–Bey*, 903 A.2d at 822. In the interest of justice, we will review the new claims even though the parties did not raise them in their initial briefs. *See Anthony v. United States*, 935 A.2d 275, 282 (D.C.2007) ("But no matter whose ox is gored when the parties are directed by the court to file supplemental submissions, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision." (internal quotation marks and citations omitted)); *District of Columbia v. Place*, 892 A.2d 1108, 1112 n. 2 (D.C.2006) ("On occasion, this court may exercise its discretion to entertain a new claim if it is purely a question of law and the factual record is complete to address

the new matter."). In this case, the factual record is complete and the parties have briefed the issue, which is one of law. We, therefore, exercise our discretion to consider their claims of instructional error. As appellants did not object to the instruction in the trial court, however, our review is for plain error. Under plain error review, appellant must show error that is clear and that affected appellants' substantial rights. If those three preliminary requirements are met, the court may notice the error and grant relief if the error would call into serious question the fairness, integrity or public reputation of judicial proceedings. *See Olano*, 507 U.S. at 732–36, 113 S.Ct. 1770.

### A. Is There Error that is "Plain"?

In this case, the trial court instructed the jury on aiding and abetting:

Any person who in some way intentionally participates in the commission of a crime aids and abets the principal offender. He therefore is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.

. . . .

*It is not necessary that defendant have had the same intent that the principal offender had when the crime was committed or that he even intended to commit the particular crime committed by the principal offender.*

*An aider and abetter is legally responsible for the acts of other persons that are the natural and probable consequence of the crime in which he intentionally participated.*

An aider and abetter is legally responsible for the principal's use of a weapon

---

**60.** Appellant Pérez, who was also convicted of first-degree murder, has not raised this claim.

See *infra*.

during the offense if the aider and abetter had actual knowledge that some type of weapon would be used, or if it was reasonably foreseeable to the aider and abetter that some type of weapon was required to commit the offense.

(emphasis added).

█ In *Wilson–Bey*, we held that it was error for the trial court to instruct the jury on aiding and abetting liability using the "natural and probable consequences" language that was included in the instruction given in this case because it allowed the jury to convict without finding the necessary *mens rea* for first-degree murder. 903 A.2d at 837–38. We explained that "[a] rule imposing criminal liability upon an accomplice for foreseeable consequences, without proof that the accomplice intended those consequences ... is ... contrary to the underlying purpose of aiding and abetting statutes, which is to 'abolish the distinction between principals and accessories and [render] them all principals.'" *Id.* at 837 (quoting *Standefer v. United States*, 447 U.S. 10, 19, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)). Such an instruction is unconstitutional because, without requiring the jury to find the necessary *mens rea* for a given crime, "a 'natural and probable consequences' rule imposes liability on an accomplice for the crime committed by the principal on the basis of the accomplice's negligence." *Id.* at 836. We have recognized that since our opinion in *Wilson–Bey*, the error is now plain because "where a law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). As there is error, and it is plain, we turn to the third prong of the plain error test addressing prejudice to appellants' substantial rights.

**B. *Did the Error Affect Appellants' "Substantial Rights"?***

█ The Supreme Court has explained that "the standard phrased as 'error that affects substantial rights,' ... has ... been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The measure is, "similar[ ] to the *Kotteakos* formulation in requiring the showing of a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *Id.* at 81–82, 124 S.Ct. 2333 (quotation omitted). However, unlike in cases of preserved error where the government bears the burden of showing that trial error was harmless, under plain error review, it is "the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Olano*, 507 U.S. at 734, 113 S.Ct. 1770; *see Kidd v. United States*, 940 A.2d 118, 127 (D.C.2007) (noting that appellant failed to satisfy third prong of plain error test because "[g]iven the government's proof ... there was no reasonable probability that the incorrect aiding and abetting instruction had a prejudicial effect on the outcome of [appellant's] trial."). In short, appellants must show that they likely would not have been convicted of first-degree murder absent the erroneous aiding and abetting instruction.

In assessing the impact of the erroneous jury instruction in this case, it is important to remember that none of the appellants inflicted the fatal stab wound and, indeed, there is no evidence at all that any of them had knives or stabbed Helm. The evidence was that they chased, beat and kicked Helm, as part of the group of those who

stabbed him. Therefore, the government's sole theory of appellants' liability for murder was as aiders and abettors.[61] The prosecutor emphasized this theory to the jury explaining that it was based on "assisting" or "helping" the actual killers.[62]

**61.** Although appellants were charged with conspiracy, there was no *Pinkerton* instruction on coconspirator liability based on an agency theory. *Cf. Wilson–Bey*, 903 A.2d at 842 ("Because the jury was not instructed on the elements of *Pinkerton* liability, a conviction for premeditated murder may not be sustained on that basis."). Moreover, as the jury was instructed that it could find appellants guilty of conspiracy to murder *or* to assault, see *supra*, note 16, we cannot rely on the verdicts of guilty on the conspiracy charge as evidence that the jurors found that appellants had agreed to murder Helm, which would have established the mental element for first-degree murder.

**62.** The prosecutor told the jury in opening statement:

Now what won't you hear about, ladies and gentlemen? *You won't hear that any of the men on trial for murder actually put the knife in Warren Helm.* He was stabbed six times.

Some of you are probably thinking well, ... how is it that we can hold them responsible if the cause of death, as you will hear, were stab wounds to the body.

We're going to talk a lot more—in a lot more detail in closing argument. You will hear pertinent instruction from the Judge at the close of the evidence. *But the answer is simple. Aiding and abetting. Because each and every one of the men who is on trial in this case for murder assisted the people who actually stabbed Mr. Helm.*

For example, [Robles–Benevides], you've heard of, provided the knife .... [and] started beating on Mr. Helm while Mr. Helm was getting stabbed.

[Bonilla], ... he's the one who brought the stabbers after Mr. Helm.

How about some of the other men? ... Villatoro and.... Perez, they're some of the men who chased Mr. Helm. They're some of the men who surrounded Mr. Helm. They're some of the men who kicked and punched him before, during and after he was stabbed. (emphasis added).

In closing argument, the prosecutor argued at length that the jury should convict appellants as aiders and abettors because they "helped" those who stabbed to kill Helm:

Now, some of you are now saying ... Remember, you told us that none of the men on trial for murder actually put the knife in Warren Helm. .... So maybe some of you are asking yourselves, well, can we hold them responsible and should we hold them responsible?

... The answer to both of these questions is an unequivocal yes. You remember what I told you about in opening statement about the concept of aiding and abetting?.... What is aiding and abetting? Quite simply put, it's assisting someone, it's helping someone out, it's encouraging someone in the commission of a crime.

Now, some of you are saying ... so what? ... Is that aiding and abetting? A couple of things.

First of all, you've heard evidence that all of these men were involved in chasing Mr. Helm, that all of these men, when they caught up to him, were around him when he was being beaten....

... When they were doing that, what is it that they accomplish? Well, they prevented Mr. Helm from escaping. They prevented Mr. Helm from getting help. They prevented Mr. Helm from defending himself.

....

Perhaps the concept of aiding and abetting is best illustrated by way of analysis. And I'm sure when you begin to deliberate ... given your own life experience and background, will be able to come up with a very apt, right-on-the-mark analogy. So let me just throw out a few just for your consideration.

Take any sport, any team sport. When a quarterback throws to his receiver and his receiver catches the ball and scores a touchdown, who's jumping up and down celebrating that touchdown? Well, the quarterback sure is and the receiver sure is. But do you know who else is jumping up and down celebrating that touchdown ... ?

Well, those big, happy offensive linemen who were preventing the defensive linemen from rushing their quarterback and taking his head off—they're taking credit too.

... When hyenas circle their prey ... maybe a hyena all by itself can't take down that lion, but if there are enough of them

■ Aiding and abetting liability for murder requires a principal who committed the killing, *Tyree v. United States,* 942 A.2d 629, 636–37 (D.C.2008); here, the principals appear to have been Velásquez and Ventura, who were not codefendants in this case. The prosecutor specifically told the jurors that so long as they found that the principals had acted with premeditation and deliberation, they could find appellants guilty as aiders and abettors:

> Now some of you are saying, well, are you saying that for each and every one of these guys, we have to conclude that this is premeditated and deliberate? Now remember we've told you all along that our theory of the case is that these men are aiding and abetting. *So all you have to do is conclude that the principals in this case, the guys who actually put the knives in Mr. Helm, Catinga [Velásquez] and Douglas [Ventura], that they premeditated and deliberated.*

(emphasis added.)

On this record, we have no difficulty in concluding that the instructional error affected appellants' substantial rights.

C. *Did the Error Affect the "Fairness, Integrity or Public Reputation of Judicial Proceedings"?*

■ If we determine that appellants' substantial rights were affected, their convictions may be reversed if the error seriously affected the "fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 736, 113 S.Ct. 1770. The discretion to grant relief conferred by the plain error rule "should be employed 'in those circumstances in which a miscarriage of justice would otherwise result.'" *Id.* (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). The Court explained that the term "miscarriage of justice" meant, in the context of collateral review, that the defendant is actually innocent, "but [the Court has] never held that ... remedy [pursuant to plain error] is *only* warranted in cases of actual innocence." *Id.* Rather, the Court explained, "[t]he Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). In *Johnson,* the Court affirmed a conviction for perjury, where the trial court clearly erred by not submitting to the jury the question of materiality, an element of the crime, and instead took it upon itself to decide the issue. 520 U.S. at 469, 117 S.Ct. 1544. There, the Court held that even if the error affected appellant's substantial rights, there was no basis for concluding that the error should be noticed on appeal because the evidence supporting materiality was "overwhelming" and "uncontroverted" at trial. *Id.* at 470, 117 S.Ct. 1544. We have similarly affirmed convictions even where substantial rights were affected by clear trial error, where evidence of guilt was overwhelming. *See Kidd,* 940 A.2d at 128–29 (fourth prong not met when appellant "had

> and they circle him, that lion is helpless.....
>
> ... Think of something like a classical music concert....
>
> ... you know who's taking the ovation ... Of course, those violinists, right, who've been playing throughout, and the cellists and all those other people ... the guy back there ... because he's part of the team....

> And that['s] what this case boils down to.... Maybe, maybe this case wouldn't have happened if it was only [Villatoro]. If it was just his fight and only his fight, you really think Warren Helm would be dead today?
>
> Or if it was ... Perez, his fight and only his fight, do you really think Mr. Warren Helm would be dead today?

a fair opportunity to present his case to the jury"; "reasonable jurors could conclude that the testimony of the eyewitness[es] ..." was credible and reliable; and "based upon [appellant's] own words during his interview with [the police], [appellant] had a motive to participate in a plan to shoot and kill [the victim]."). We have also affirmed where the absence of error would not have affected the evidence at trial. *See Otts v. United States,* 952 A.2d 156, 163 (D.C.2008); [63] *Thomas v. United States,* 914 A.2d 1, 23–24 (D.C. 2006).[64]

▆▆▆▆▆ This case is different. Here, the nature of the instructional error is such that, unless, as in *Johnson,* 520 U.S. at 470, 117 S.Ct. 1544 there was "overwhelming" evidence of the required element—here, intent to kill with premeditation and deliberation—by each individual

appellant personally, the erroneous aiding and abetting instruction did affect the integrity of the proceeding because it would have led the jury to wrongfully convict appellants who otherwise would not be guilty of first-degree murder. A wrongful conviction necessarily affects the integrity of this proceeding and impugns the public reputation of judicial proceedings in general. *See Harvey v. Horan,* 285 F.3d 298, 316 (4th Cir.2002) ("[T]he interest of our criminal justice system is not only in convicting the guilty but also in ensuring that the innocent are not wrongfully convicted."); *United States v. Pelullo,* 14 F.3d 881, 894 (3d Cir.1994) ("Our system of criminal justice prides itself on the ability to assure that no innocent person is convicted wrongfully.... We strive to achieve the aim that 'guilt shall not escape or innocence suffer.'" (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct.

---

**63.** Convictions for possession and distribution of heroin were affirmed in *Otts,* where a chemist's report was admitted without the chemist's presence, because appellant failed to satisfy the fourth prong of the plain error test. The court found that the error did not affect the fairness of the proceeding for the same reasons enunciated in *Thomas,* discussed *infra. See Otts,* 952 A.2d at 162. As to the integrity of the proceeding, there was no reason to doubt the reliability of the report because of the overwhelming evidence that what appellant had in his possession was heroin. *Id.* at 162–63 ("[S]everal officers ... observed appellant in an open air drug market and, moments before arrest, hand [to co-defendant] a small object in exchange for U.S. Currency.... [As the officers approached appellant] they could see appellant place an object in his mouth and begin to chew .... [an officer] recognized from his experience that [what appellant expelled from his mouth] was heroin residue.").

**64.** In *Thomas,* we affirmed appellant's conviction for distribution of cocaine although the trial court clearly erred in admitting a chemist's report analyzing the drug without the presence of the chemist at trial in violation of appellant's right to confrontation. There, we declined to grant relief to appellant because

we held that appellant did not satisfy the fourth prong of the plain error test. *See Thomas,* 914 A.2d at 23. The error did not affect the fairness of the proceeding because appellant had a "fair opportunity to investigate and challenge the chemist's report, and ... could have subpoenaed and cross-examined the chemist if appellant doubted her findings, qualifications, or methodology." *Id.* Nor did the error affect the integrity of the proceeding where "there [was] no reason whatsoever to believe that the chemist's report was unreliable." *Id.* The evidence at trial established that "the circumstances of the sale itself, the ziplock packaging of the drugs," the physical appearance of the contents (a "white rocky substance"), "the positive field test conducted by [the police], and expert witness concerning the *modus operandi* of drug dealing ... strongly corroborated the chemist's identification." *Id.* Moreover, we noted that the reliability of the chemist's report was supported by "the objective and routine nature of the testing, the use of a well-established chemical procedure, the duty of the chemist to be accurate, and the absence of any motive on the part of the chemist to falsify the results." *Id.*

629, 79 L.Ed. 1314 (1935))). While plain error's third prong (prejudice to an individual defendant) and the fourth (prejudice to the integrity of the judicial system) are distinct, some of the same considerations necessarily feature in both where a jury may have been erroneously led to convict on an unlawful basis. Therefore, if there is a reasonable probability that the jury convicted appellants for first-degree murder as aiders and abettors without finding that they, personally, had the intent to kill, and that they deliberated and premeditated upon it, and there is no evidence that would independently compel such a finding, the fourth prong also is necessarily satisfied. *Cf. Johnson*, 520 U.S. at 470, 117 S.Ct. 1544 (error did not warrant correction when supported by "overwhelming" and "uncontroverted" evidence).

### D. *Application to Appellants' Trial*

With this understanding of the framework for analysis under plain error review, we turn to analyze the evidence presented to the jury with respect to each appellant's role in Helm's murder.

#### 1. *Robles–Benevides*

The evidence showed that appellant Robles–Benevides was in the car that caught up with Helm as he tried to escape the group chasing him up 14th Street. In the car, Robles–Benevides struggled over a knife with Velásquez, who used a knife to stab Helm. Benítez testified that Robles–Benevides told him, when they were both in jail, that he had fought with Velásquez about who was going to have the knife:

[Robles–Benevides] said to me that he had a blade with him. That when he was in [Bonilla's] car, that [Robles–Benevides] and [Velásquez] were fighting over a knife.

. . . .

[Robles–Benevides] said to me that [Velásquez] was asking him for the knife. . . . [Robles–Benevides] said that [Velásquez] kept on asking him for the knife because he wanted to stab the deceased.

[Robles–Benevides] said to [Velásquez] that he was going to do it. And so they were fighting over the knife, the two of them.

When they got close to where the deceased was, Carlos gave the knife to [Velásquez]. . . .

Although there was no evidence that Robles–Benevides stabbed Helm, the eyewitnesses testified that he personally participated in the attack: García saw him "kicking and punching" Helm; Alemán, Benítez and José Pérez saw him hit Helm; and Hallner testified that he saw him deliver a vicious kick to Helm's chest while he was lying on the ground. Robles–Benevides argued that that he had done so in self-defense, because Helm had hit him first.

The jury verdict shows that it rejected Robles–Benevides's claim of self-defense.[65] He argues, however, that the evidence that he hit and kicked Helm and had struggled with Velásquez over the knife does not reasonably permit an inference that he intended to kill Helm, only that he gave up the knife that, as it turned out, was used by someone else (Velásquez) to kill Helm during the assault.

We have explained the *mens rea* required for first-degree murder:

---

65. Even though the jury rejected Robles–Benevides's claim of self defense, we do not know whether the jury completely disbelieved his account that Helm hit him first, or determined that the severity of his assault on Helm was unjustified by any provocation Helm might have initiated.

First-degree premeditated murder is murder committed with the specific intent to kill after premeditation and deliberation. *Williams v. United States,* 858 A.2d 984, 1001 (D.C.2004). "Premeditation means that the defendant formed the specific intent to kill the victim for some length of time, however short, before the murderous act." *Id.* (internal quotation marks and citations omitted). Deliberation, "which is separate from premeditation, requires that there was the reflection and turning over in the mind of the accused concerning his existing design and purpose to kill." *Id.* (internal quotation marks and citation omitted). Thus, in order for a charge of first-degree premeditated murder to be sustained, "the evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity." *Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979).

*Kitt v. United States,* 904 A.2d 348, 353 (D.C.2006).

The government argues that in closing argument the prosecutor emphasized to the jury the significant role that Robles–Benevides played in the murder and pointed to his own premeditation and deliberation: "What on earth do you think Carlos Robles–Benevides was thinking during that chase when he gave the knife to [Velásquez]? . . . he was fighting for that knife because he wanted to stab Mr. Helm. Premeditation and deliberation? That's right there." But the prosecutor made essentially the same argument to the jury with respect to appellants Bonilla and Villatoro, as to whom the government now concedes their first-degree murder convictions must be reversed.[66] Moreover, the prosecutor's argument that appellants had premeditated and deliberated was immediately followed by the prosecutor's offer to the jurors that they need not find "for each and every one of these guys . . . that this is premeditated and deliberated." Indeed, the jurors were relieved of any obligation to evaluate the evidence of individual intent by the prosecutor's erroneous admonition that "all you have to do is conclude that the principals in this case, the guys

**66.** The prosecutor argued:

Now, look how far Mr. Helm had to run. Now, what on earth do you think the men who were chasing him by foot and in the car, what on earth do you think they were thinking when they were chasing him down? And what on earth do you think Carlos Robles–Benevides was thinking during that chase when he gave the knife to Catinga? And not only did he give the knife, you've heard, he was fighting for that knife because he wanted to stab Mr. Helm. Premeditation and deliberation? That's right there.

. And what on earth was Santos Bonilla thinking when he's driving up the street and he's driving two armed men up the street? How do you know he knew? You have the videotape. On that videotape it's clear, it's unequivocal. They got into my car; they had knives.

He drives them there to the crime scene, he chases after Mr. Helm, delivers the stab-

bers, he waits around. And he does more than wait. We've heard testimony that he actually physically participated. And that makes sense, right?

You're in this just like everyone else. You know all of these guys. You're pumped up just like everyone else. Not only are you the chauffeur, if you will—you're delivering these guys—but you jump out of that car and you smack him in the face. Premeditation and deliberation, ladies and gentlemen.

With respect to Bonilla specially, the prosecutor argued:

On March 15th, 1998, his car was as deadly as any knife. And do you know why? There's no question that both of these stabbers came from his car. If he didn't drive them there, if he didn't have that car, do you really think these guys would be here today? On March 15th, 1998, his car was deadly as any knife.

who actually put the knives in Mr. Helm, Catinga [Velásquez] and Douglas [Ventura], that they premeditated and deliberated." With respect to appellants, the prosecutor advised, "the only issue ... is one of foreseeability.... Now, what do you think is reasonably foreseeable when you're running up, when you're chasing this man and you're in a mob?"

We have held that there are instances where there is enough in the factual record to affirm a first-degree murder conviction on an aiding an abetting theory of liability despite an erroneous instruction like the one given in this case. In *Kidd,* a plain error case, we affirmed appellant's conviction for first-degree murder when he stood on one side of the victim while pointing a gun at his stomach; a second person stood on the other side with a gun; a third person came around the back and shot the victim in the head; and appellant immediately fled the scene. 940 A.2d at 128. We held that "[o]n the record before us, reasonable jurors could infer and conclude ... that beyond a reasonable doubt [appellant] had thought about and reflected on killing [the victim], and further that he had the specific intent to participate in the killing...." *Id.* Based upon that evidence, which was countered only by defendant's "self-serving statement" that he was home at the time of the killing, and, importantly, the prosecutor's emphasis "at the outset and end of its case before the jury" on the elements of premeditation and deliberation, we were "convinced" that the first-degree murder conviction was based on the jurors having inferred " 'from the facts and circumstances surrounding [the] murder,' that [the defendant] had 'the requisite *mens rea.*' " *Id.* (quoting *Kitt,* 904 A.2d at 353).

In *Downing v. United States,* 929 A.2d 848 (D.C.2007), another plain error case, we likewise affirmed a first-degree murder

conviction despite an erroneous aiding and abetting instruction, where we concluded that "no reasonable juror could have concluded that [the defendant] had any intent other than to kill ... nor could a reasonable juror have concluded that the actions taken by [the defendant] were anything other than deliberate and premeditated." *Id.* at 863. In *Downing,* the evidence showed that the defendant, who was the first in the group to suggest killing the victim, directed others to the location where the murder took place, took the victim out of the car when they arrived at the location, and stood next to the person who actually fired the fatal shot. *See id.*

Finally, in *Wilson–Bey,* on harmless error review, we affirmed appellant Wilson–Bey's first-degree murder conviction, where the evidence showed that after declaring "I am going to kill that bitch" for having beaten up her younger sister, Wilson–Bey led a group armed with various weapons to the victim's apartment, swung her knife multiple times at the victim, and stabbed the victim near the eye. 903 A.2d at 845. Based on that evidence, we determined that "[a]ny impartial trier of fact who credited the prosecution's evidence would ... be bound to conclude that ... Wilson–Bey intended to kill the decedent, tried to kill her, and succeeded in doing so, either by personally causing her death or by abetting a knife-wielding confederate who actually inflicted the fatal wound if ... Wilson–Bey did not." *Id.* at 846–47.

Although we agree with the government that the evidence against Robles–Benevides was significant, and without a doubt sufficient for conviction of first-degree murder, it was not so compelling that we can say that there is no "reasonable probability" that the verdict was unaffected by the error. *See Dominguez Benitez,* 542 U.S. at 81–82, 124 S.Ct. 2333. Neither Robles–Benevides's statement to Velás-

quez (as related by Benítez) that he "was going to do it" while they struggled over the knife in the car, nor his participation in the assault that resulted in Helm's death reflected the personally-expressed intent to kill of the assailants whose convictions we affirmed in *Wilson–Bey* and in *Kidd*, or the "cool-headed" direction and control of the fatal shooting in *Downing*, where we found the evidence "overwhelming." *Downing*, 929 A.2d at 863–64. And, unlike in *Kidd*, where we relied on the prosecutor's emphasis to the jury that first-degree murder required premeditation and deliberation, *see* 940 A.2d at 128, in this case the prosecutor urged that the "only issue" that the jurors needed to decide was whether the killing of Helm was foreseeable—the very theory we concluded in *Wilson–Bey* is "contrary" to the aiding and abetting statute. 903 A.2d at 837.

Rather, we find this case analogous to the more ambiguous situations in *Wilson–Bey* and *Coleman*, where we reversed the first-degree murder convictions of Marbury and Jones, respectively. In *Wilson–Bey*, we reversed defendant Marbury's conviction for first-degree murder as an aider and abettor because "taking the evidence as a whole, an impartial juror might readily have a reasonable doubt whether Ms. Marbury in fact formed an intent to kill [the victim], as distinguished from an intent to join with others in beating up [the victim] and her friends." 903 A.2d at 845. There, cooperating witnesses testified that Marbury and her friends went to the victim's apartment to find out why she had beaten up Marbury and to "fight" her and her friends. *Id.* Unlike her sister (Wilson–Bey) whose first-degree murder conviction we affirmed, Marbury did not wield a knife and stab the victim. Also, while a witness's testimony that Marbury openly declared her intention to "kill that bitch" may have permitted the jury to find that she had deliberated and premeditated

on the intent to kill, *see id.* at 844, we noted that the strength of that testimony was weakened by substantial impeachment. *See id.* at 845. Here, it is undisputed that Robles–Benevides did not use a knife at any time during the assault on Helm. Although it can be inferred from the evidence that, more than any other appellant, Robles–Benevides knew that a knife was in the equation when they reached and attacked Helm, this situation is indistinguishable from Marbury's, where a "group of eight, including both [Marbury and Wilson–Bey], armed themselves with knives and baseball bats and set out in a van for [the victim's] apartment." *Id.* at 823. Furthermore, just as Marbury's comment that she was "going to kill that bitch" was impeached, Benítez—who was the sole witness to relate the conversation during which Robles–Benevides said that he wanted "to do it" as he struggled with Velásquez over the knife—was also impeached. Defense counsel pointed out that Benítez had pleaded out of trial and had a motive to testify favorably for the government by falsely accusing Robles–Benevides. Defense counsel suggested in cross-examination that it was really Benítez who had the knife, and that the government pressured him to finger Robles–Benevides instead. Gilfredo López, who had been in jail with Robles–Benevides and Benítez, testified that Benítez told him that the government wanted Benítez to testify that Robles–Benevides passed a knife to Velásquez.

In *Coleman*, defendant Jones gave a machine gun to his confederate, Coleman, who then shot the victims to death, after Jones equivocally said: "fuck" "'em." 948 A.2d at 550–51. We held that while the evidence was *sufficient* to convict Jones for second-degree murder, *see id.* at 551, it was not so overwhelming to "ease our concern that the jury might have convicted based on the 'natural and probable conse-

quences' theory." *Id.* at 554. In this case, Robles–Benevides only reluctantly relinquished the knife to Velásquez, who later stabbed Helm to death—as opposed to Jones who gave the machine gun to Coleman. In reversing Jones's conviction in *Coleman* we explained that the jury may not have understood the statement— "fuck" "em"—as an "execution order" because "the jury also could have interpreted the comment as indicating a desire not to kill the victims, *i.e.*, 'never mind,'" or a disinterested "I don't care." *Id.* at 553. Similarly, Robles–Benevides's conversation with Velásquez in the car does not compel a finding that he had the specific intent to kill and that he premeditated or deliberated. Nowhere in the conversation did Robles–Benevides explicitly say that either he or Velásquez wanted to "kill" the victim. Rather, he said Velásquez told him that he wanted to "stab the deceased," and that he fought over the knife because he himself "was going to do it." Here, the jury could infer that, rather than killing Helm, Robles–Benevides expressed a desire to use the knife to inflict a wound by "stabbing," and understood Velásquez to mean the same. While premeditation and deliberation can take place in a few seconds, *see Downing,* 929 A.2d at 862, and it is certainly *possible* that Robles–Bonilla premeditated and deliberated Helm's death during the car chase while fighting over the knife with Velásquez, it is at least equally plausible that he did not intend to kill Helm at all, but only to injure Helm by stabbing him with the knife.[67]

Although the evidence in this case clearly established that Robles–Benevides participated in the assault on Helm, the evidence from which the jury could have inferred that he himself had the specific intent to kill Helm and did so with premeditation or deliberation was circumstantial and its source was impeached. The erroneous jury instruction, however, could well have relieved the jurors from having to make that assessment, by misleading them into convicting appellant of first-degree murder as an aider and abettor even if it found that, although Robles–Benevides did not himself premeditate or deliberate Helm's murder, the "natural and probable consequence" of his participation in the assault was Helm's death. As in *Wilson–Bey,* where we reversed Marbury's first-degree murder conviction because the jury might have been misled by the erroneous instruction, so that "a juror who believed that Ms. Marbury's intent was merely to join in an *assault* . . . could nevertheless reasonably find Ms. Marbury guilty of aiding and abetting armed *premeditated* murder," 903 A.2d at 845, the jury in this case also could have been misled into convicting Robles–Benevides of first-degree murder so long as it found that he hit and kicked Helm in the course of the assault that ended in a fatal stabbing by someone else. That is all the more likely here because, in addition to the erroneous instruction given to the jury, the prosecutor told the jurors in closing that all they needed to find in order to convict appellants of first-degree murder was that the principals had premeditated and deliberated, so long as the

**67.** Although the error in *Wilson–Bey* and *Coleman* was preserved, their analyses for harmless error still provide guidance here where we review for plain error. Significantly, we reversed Marbury's conviction in *Wilson–Bey* even though she personally expressed a claim "to kill that bitch"—there is no similarly pointed statement attributed to Robles–Benevides. And in *Coleman,* we reversed a second-degree murder conviction, which does not require the element of premeditation and deliberation that the trial court's instruction failed to convey and the prosecutor's argument expressly dismissed as irrelevant to appellant's guilt.

stabbing and killing were foreseeable. In the absence of compelling evidence that Robles–Benevides personally had the intent to kill and acted with deliberation and premeditation in doing so, "the probability of a different result is sufficient to undermine the confidence in the outcome of the proceeding," *Dominguez Benitez,* 542 U.S. at 83, 124 S.Ct. 2333 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052), and it would be a miscarriage of justice to let him stand convicted of a crime that he did not commit. *See Olano,* 507 U.S. at 736, 113 S.Ct. 1770.

 We conclude, however, that on this record Robles–Benevides can be convicted of murder in the second degree.[68] *See Rutledge v. United States,* 517 U.S. 292, 306, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996); *Willis v. United States,* 692 A.2d 1380, 1382–83 (D.C.1997). We have extended our ruling in *Wilson–Bey* to second-degree murder which requires a particularized showing of *mens rea. See Coleman,* 948 A.2d at 552–53 (citing *Kitt,* 904 A.2d at 356). For second-degree murder, the intent required is malice, which can be proven by evidence of a specific intent to kill, specific intent to inflict serious bodily harm, or wanton and willful disregard of an unreasonable human risk—also known as "depraved heart"

murder.[69] *Comber v. United States,* 584 A.2d 26, 38–39 (D.C.1990) (en banc). Second-degree murder is a lesser-included offense of first-degree premeditated murder, *see Woodard v. United States,* 738 A.2d 254, 259 n. 10 (D.C.1999), and the jury was properly instructed on second-degree murder. Here, the jury might not have found that appellant acted with premeditation and deliberation, or even had the specific intent to kill, but it surely must have found beyond a reasonable doubt that in his desire to use a knife (enough to fight over it with Velásquez) Robles–Benevides at least had the intent to inflict serious bodily harm, or that he acted with wanton and willful disregard of an unreasonable risk to human life when he gave the knife to Velásquez, knowing that he would use it to harm Helm. Moreover, such an intent could also be inferred even if the jury discounted the evidence that Robles–Benevides gave a knife to Velásquez (due to impeachment of Benítez and testimony of López), through his joining in a group assault and viciously kicking Helm.

 Thus, because the erroneous aiding and abetting instruction would not have affected appellant's substantial rights had he been convicted of second-degree murder while armed,[70] we reverse the con-

---

**68.** Although the government argues that Robles–Benevides's first-degree murder conviction should stand, in the alternative it contends that we should instruct the trial court to enter a conviction for second-degree murder. *Cf. Wilson–Bey,* 903 A.2d at 847 n. 51 (reversing first-degree murder conviction without instruction after noting that government had not requested judgment on lesser-included offense). In his brief Robles–Benevides asks for a new trial, or in the alternative, a second-degree murder conviction as a lesser-included offense.

**69.** The court also explained that at common law there was a fourth kind of malice: a killing that occurs in the course of an inten-

tional commission of a felony. *See Comber,* 584 A.2d at 39–40. This concept, now better known as "felony-murder," has been codified in the District of Columbia as a type of first-degree murder. *See* D.C.Code § 22–2101 (2001).

**70.** The erroneous aiding and abetting instruction did not affect the "while armed" portion of the crime, D.C.Code § 22–4502(a) (2001), because "intent is not an element that needs to be proved under section 22–4502(a)." *Broadie v. United States,* 925 A.2d 605, 617 (D.C.2007). "As an enhancement provision, [section 22–4502(a)] does not require the *use* of or the *intent to use* a weapon ... it requires mere availability of a weapon." *Id.* (quoting

viction for first-degree murder while armed and remand the case to the trial court with the instruction to vacate that conviction and enter judgment of conviction and resentence for murder in the second-degree while armed.

## 2. *Bonilla*

The evidence established that Bonilla was the driver of the car that chased Helm, that he participated in assaulting Helm, and that he drove the getaway car after the murder. Bonilla admitted that he drove the car to the scene of Helm's assault and eventual murder, and told the police in a taped interview that he knew his passengers in the back seat carried knives. He also admitted that he came out of the car when the others got out to attack Helm, but denied participating in the assault. He explained that he drove the getaway car only to appease Velásquez, whom he had just seen "knifing-supposedly knifing the black man." Alemán contradicted Bonilla, however, and testified that Bonilla punched Helm before he went back to his car.

In convicting appellant Bonilla of first-degree murder and conspiracy to assault or to commit murder, the jury clearly rejected Bonilla's story that he was an innocent third party who simply thought he was giving his friends a ride. Bonilla, however, did not himself have a weapon and he is not reported to have expressed a purpose to kill Helm. He had no apparent individual motive to do so, and appears to have been swept up in the frenzy of the mob. *See Frendak*, 408 A.2d at 371 (contrasting premeditation of first-degree murder with impetuosity of second-degree murder in "orgy of frenzied activity").

Thus, while we agree with appellant (and the government concedes) that the erroneous aiding and abetting instruction may have led the jury to find him guilty of first-degree murder without finding that he had the requisite specific intent to kill with premeditation and deliberation, we disagree with appellant that the evidence is insufficient to enter instead a conviction for second-degree murder. Appellant is correct to point out that the erroneous aiding and abetting instruction would have been error and no less plain in the context of second-degree murder. But appellant fails to persuade us that the error affected his substantial rights if he were to stand convicted of second-degree murder.

Here, the evidence was such that appellant would have been convicted of second-degree murder independent of the error. *See Kidd*, 940 A.2d at 127 ("Given the government's proof, . . . there was no reasonable probability that the incorrect aiding and abetting instruction had a prejudicial effect on the outcome of [appellant's] trial."). While Bonilla did not deny that he drove the assailants, he tried to distance himself as much as he could from the crime. Bonilla testified on direct examination that although he agreed to take appel-

*Washington v. United States,* 366 A.2d 457, 461 (D.C.1976)).

Here, the jury was properly instructed:

Both first-degree murder while armed and second-degree murder while armed have as an element that the defendant was armed with or had readily available a dangerous or deadly weapon. A dangerous or deadly weapon is any object likely to produce death or great bodily injury by the use made of it.

In deciding whether a defendant was armed with or had readily available a deadly or dangerous weapon, you may consider all of the circumstances surrounding its possession and use.

The court also instructed that the evidence allowed the jury to consider as weapons, "knives, sharp objects and shod feet."

lant Robes–Benevides, Velásquez and Ventura in his car, he did so unwittingly and remained unaware of his passengers' motive until Velásquez ordered him to stop the car and saw Velásquez "knife" Helm. Bonilla testified that he stepped out of the car to close the doors that his passengers left open, and tried to flee the scene. But, according to Bonilla, Velásquez caught up with him when he was stopped at a red light, and Bonilla was too afraid to ask Velásquez to leave. Salamanca corroborated parts of Bonilla's testimony. He said that although he was "blacked out" when everyone got in the car, he woke up in time to see Velásquez reenter the car and order Bonilla to drive him to a gambling hall.

If the jury had accepted Bonilla's story, not only would they have acquitted him of first-degree murder while armed, but also of conspiracy to assault or to commit murder. Although the conviction for first-degree murder is tainted by the erroneous aiding and abetting instruction, however, the conspiracy conviction is not. Thus, the jury clearly believed that Bonilla (1) shared a common understanding with his coconspirators that they were going after Helm to assault or kill him; (2) undertook to deliver the assailants to Helm; and (3) one of the coconspirators committed an overt act-which may have included Bonilla's driving them. *See Pearsall v. United States*, 812 A.2d 953, 960 (D.C.2002) ("The elements of the crime of conspiracy to commit [a crime] are that: (1) two or more persons formed an agreement to commit a [crime]; (2) the defendant knowingly participated in the conspiracy with the intent to commit the offense; and (3) at least one person involved in the conspiracy committed one of the charged overt acts."). There was sufficient evidence for the jury

to find that Bonilla conspired to assault and murder Helm. Contrary to Bonilla's testimony, both Rosa García and Benítez saw Bonilla waiting in the car with the doors open while his friends beat and killed Helm. Alemán saw him actually punch Helm before he reentered the car. Even if we take into account the weakness of each witness's testimony as discussed *supra*, Bonilla's own videotaped statement provided the strongest evidence that he knowingly involved himself in Helm's assault and murder:

> [Interpreter for Bonilla]: They—they brought them with them to the car. When they got in the car they already—they already had them with them.
>
> [Police]: Okay, and [you] saw that?
>
> [Interpreter]: They already brought the knives.
>
> [Police]: Okay, but I'm saying [you] did see the knives?
>
> [Interpreter]: Yes.

Bonilla, who had given this statement almost three weeks after the incident, tried to explain it away more than seven months later at trial. Bonilla explained that although he told the police that he had seen the knives when his passengers entered the car, "I said that because presumably they were the ones who had the knives. They got out with the knives. But not that I had seen the knives." This explanation would have made little sense to the jury in light of Bonilla's testimony that he saw only Velásquez "knifing" Helm [71] although he reiterated that more than one person ("they") had knives. The jury clearly discredited Bonilla's attempt to portray himself as a forced recruit by convicting him not only of first-degree murder while armed, but also of conspira-

---

71. The prosecutor asked Bonilla, "Did you see what happened?" He answered, "Yes. Catinga was knifing—supposedly knifing the black man."

cy to assault or to commit murder. *See, e.g., Sparks v. United States,* 755 A.2d 394, 399 (D.C.2000) ("[I]t is the jury's province to resolve questions of credibility and to make reasonable inferences from the evidence.").

Although Bonilla participated in the assault and may have known that the actual reason for driving his friends was to catch Helm, the evidence at most established that Bonilla participated with malice— enough for conviction of second-degree murder—but not that he acted with premeditation and deliberation. *See Kitt,* 904 A.2d at 354 (reversing first-degree murder conviction for insufficient evidence where "there was no proof that [defendant, who carried out a preconceived plan to rob and abduct] was carrying a handgun or that he was the shooter"). In participating in the assault on Helm with the knowledge that one of his cohorts carried a knife, Bonilla acted with a wanton and willful disregard of an unreasonable risk to human life. There was no evidence that Bonilla was provoked or his actions justified, so as to mitigate a finding of malice. *See Comber,* 584 A.2d at 41. Therefore, since appellant had the requisite intent for second-degree murder, the erroneous aiding and abetting instruction would not affect appellant's substantial rights had he been convicted of second-degree murder. We therefore reverse Bonilla's conviction of first-degree murder while armed and remand the case to the trial court with instructions to vacate that conviction and enter judgment and resentence him for murder in the second degree while armed.

### 3. *Villatoro*

Evidence that appellant Villatoro premeditated and deliberated Helm's murder is even more tenuous. Villatoro initially set off the chain of events by picking a fight with the homeless man outside the nightclub. When Helm and his friends joined the fight in defense of the homeless man, some members of the gang pulled out a knife. Helm's friends retreated to the car, leaving Helm to fend for himself. Alemán saw Villatoro chasing Helm on foot, and three witnesses—Alemán, José Pérez and Rosa García—saw Villatoro kicking and punching Helm. The verdict finding Villatoro guilty of murdering Helm shows that the jury credited this evidence and found that Villatoro not only conspired, but himself participated in the attack on Helm.

The government concedes that the evidence fails to show, however, that Villatoro acted with premeditation or deliberation to kill Helm as required for a conviction of first-degree premeditated murder. Villatoro's participation in the assault, even if he knew that some members of his gang intended to use a knife, only goes so far as to show that he had a wanton and willful disregard of an unreasonable risk to human life. *See Coleman,* 948 A.2d at 551. On this evidence, the erroneous aiding and abetting instruction would not have affected Villatoro's substantial rights had he been convicted of second-degree murder. Therefore, we reverse the conviction for first-degree murder while armed and remand the case to the trial court with instructions to enter judgment and resentence him for murder in the second degree while armed.

### 4. Pérez

Unlike his coappellants, Pérez did not submit a supplemental brief challenging his first-degree murder while armed conviction based on the erroneous aiding and abetting instruction. Understandably, the government does not address this issue. The evidence against Pérez, however, appears to be similar to that against Villatoro, whose first-degree murder while armed

conviction the government concedes must be reversed. Like Villatoro, Pérez was among those who chased Helm on foot, and beat him. There is no evidence that he had a knife, or that he said or acted in a way that expressed his intent to kill Helm. In the absence of any briefing on the issue, we will not reverse Pérez's conviction for first-degree murder while armed. We note, however, that on remand, the trial court may, after hearing from the parties, determine whether the conviction should be reversed in the interest of justice, without imposing a bar of cause and prejudice.

\* \* \*

For the foregoing reasons, we reverse the first-degree murder while armed convictions of appellants Robles–Benevides, Bonilla and Villatoro and remand their cases to the trial court with instructions to enter, instead, convictions for murder in the second degree while armed and resentence them accordingly. On remand, the trial court may consider whether Pérez's conviction of first-degree murder while armed should stand, consistent with this opinion, and appoint new counsel if the trial court deems it appropriate. In all other respects, appellants' convictions are affirmed.

*So ordered.*